RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DANNY HILL,

> *Petitioner-Appellant,*

*v.*

TIMOTHY SHOOP, Warden,

> *Respondent-Appellee.*

Nos. 99-4317/14-3718

On Petition for Rehearing En Banc

United States District Court for the Northern District of Ohio at Youngstown.
No. 4:96-cv-00795—Paul R. Matia and John R. Adams, District Judges.

Argued En Banc: December 2, 2020

Decided and Filed: August 20, 2021

Before: SUTTON, Chief Circuit Judge; MERRITT, MOORE, COLE, CLAY,
GIBBONS, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR,
BUSH, LARSEN, NALBANDIAN, and READLER, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED EN BANC:** Vicki Ruth Adams Werneke, FEDERAL PUBLIC DEFENDER'S
OFFICE, Cleveland, Ohio, for Appellant. Benjamin M. Flowers, OFFICE OF THE OHIO
ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON SUPPLEMENTAL BRIEF:**
Vicki Ruth Adams Werneke, Lori B. Riga, FEDERAL PUBLIC DEFENDER'S OFFICE,
Cleveland, Ohio, for Appellant. Benjamin M. Flowers, Stephen E. Maher, Michael J.
Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.
Sarah K. Campbell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville,
Tennessee, Kevin J. Truitt, DISABILITY RIGHTS OHIO, Columbus, Ohio, for Amici Curiae.

---

[*]Pursuant to 6 Cir. I.O.P. 35(c), Composition of the En Banc Court, Judge Merritt, senior judge of the court
who sat on the original panel in this case, participated in this decision. Judge Murphy recused himself from
participation in this decision.

GIBBONS, J., delivered the opinion of the court in which SUTTON, C.J., and GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, and READLER, JJ., joined. MOORE, J. (pp. 29–63), delivered a separate dissenting opinion, in which MERRITT, COLE, CLAY, WHITE, STRANCH, and DONALD, JJ., joined. An excerpt of the panel's 2018 opinion, *see* 881 F.3d 483 (6th Cir. 2018), is appended, (app. 64–81).

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge. In this death penalty habeas case, appellant Danny Hill seeks collateral review of his conviction for the murder of Raymond Fife, a twelve-year-old boy. The case has been to the Supreme Court once and before panels of this court twice. The core issue in the underlying state case was whether Hill was ineligible for the death penalty because he is intellectually disabled, a question that became pertinent after the Supreme Court's 2002 decision in *Atkins v. Virginia*. 536 U.S. 304 (2002). Before us, the issues are whether, under governing AEDPA review principles, the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We conclude that the state court's resolution of the issue does not meet either of the criteria that would permit a federal court to disturb a state conviction. Thus, we affirm the district court's denial of Hill's petition for a writ of habeas corpus.

I.

In 1986, a three-judge Ohio state court panel convicted Hill of the murder of Raymond Fife, a twelve-year-old boy. *State v. Hill*, 894 N.E.2d 108, 111 (Ohio Ct. App. 2008). Hill abused and injured Fife in multiple horrible ways. *Id.* Fife was found by his father and died two days later. *Id.* The same panel sentenced Hill to death. *Id.* During the mitigation stage of Hill's sentencing, the court heard testimony from three medical professionals about whether Hill was

intellectually disabled.**[1]** One found that Hill's intelligence level "fluctuat[ed] between mild retarded and borderline intellectual functioning," another that Hill fell "in the mild range of mental retardation," and the last that Hill's "upper level cortical functioning indicated very poor efficiency." *Id.* at 112 (quoting *State v. Hill*, 595 N.E.2d 884, 901 (Ohio 1992)). After considering this evidence, the Ohio state court found that the record evidence suggested that Hill had a "diminished mental capacity" and that testimony suggested he would be "categorized as mildly to moderately retarded." *Id.* (quoting *State v. Hill*, Nos. 3720, 3745, 1989 WL 142761, at *32 (Ohio Ct. App. Nov. 27, 1989)). The Ohio Court of Appeals and Ohio Supreme Court both affirmed the trial court's imposition of the death penalty because they found that the aggravating circumstances outweighed any mitigating factors, including Hill's diminished intellectual capacity. *Id.*

In 2002, the Supreme Court decided *Atkins v. Virginia*, which held that it was unconstitutional to execute the intellectually disabled. 536 U.S. 304 (2002). The *Atkins* Court provided some discussion of the clinical definitions of intellectual disability, but it left it to the states to "develop[] appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* at 317 (second alteration in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)). In *State v. Lott*, the Ohio Supreme Court articulated a three-part test for establishing intellectual disability based on *Atkins*: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." 779 N.E.2d 1011, 1014 (Ohio 2002), *overruled by State v. Ford*, 140 N.E.3d 616 (Ohio 2019).

In response to *Atkins*, Hill filed a petition for state post-conviction relief in 2003. *State v. Hill*, 894 N.E.2d at 113. The trial court held an evidentiary hearing, and Hill, the prosecution, and the court each chose a medical expert to evaluate Hill's intellectual capabilities. *Id.* Hill retained Dr. David Hammer, a professor and director of psychology services at the Ohio State University; the prosecution hired Dr. Gregory Olley, a professor and director of the Center for

---

**[1]**At the time, the condition was referred to as "mental retardation." While some of the past decisions and material we cite use that outdated terminology, the preferred term in the current lexicon is "intellectual disability." *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

the Study of Development and Learning at the University of North Carolina at Chapel Hill; and the court appointed Dr. Nancy Huntsman, a forensic psychologist who worked at the Court Psychiatric Clinic in Cleveland, Ohio. *Id.* The Ohio Court of Appeals, in reviewing Hill's *Atkins* claim, described the trial court proceedings as follows:

> In April 2004, Drs. Olley, Hammer, and Huntsman evaluated Hill at the Mansfield Correctional Institution for the purposes of preparing for the *Atkins* hearing. At this time, Hill was administered the Wechsler Adult Intelligence Scale ("WAIS–III") IQ test, the Test of Mental Malingering, the Street Survival Skills Questionnaire, and the Woodcock–Johnson–III. The doctors concurred that Hill was either "faking bad" and/or malingering in the performance of these tests. As a result, the full scale IQ score of 58 obtained on this occasion was deemed unreliable, and no psychometric assessment of Hill's current adaptive functioning was possible. Thus, the doctors were forced to rely on collateral sources in reaching their conclusions, such as Hill's school records containing evaluations of his intellectual functioning, evaluations performed at the time of Hill's sentencing and while Hill was on death row, institutional records from the Southern Ohio Correctional Institution and the Mansfield Correctional Institution, interviews with Hill, corrections officers, and case workers, and prior court records and testimony.

> The evidentiary hearing on Hill's *Atkins* petition was held on October 4 through 8 and 26 through 29, 2004, and on March 23 through 24, 2005. Doctors Olley and Huntsman testified that in their opinion, Hill is not mentally retarded. Doctor Hammer concluded that Hill qualifies for a diagnosis of mild mental retardation.

*Id.* at 113–14.

The trial court held that Hill was not intellectually disabled and rejected his *Atkins* claim. *Id.* at 114. The Ohio Court of Appeals affirmed, finding that Hill failed to prove he suffered from two or more significant limitations in adaptive skills that manifested before age 18. *Id.* at 126–27. The Ohio Supreme Court, with two justices dissenting, declined to hear Hill's appeal. *State v. Hill*, 912 N.E.2d 107 (Ohio 2009) (Table).

Hill then filed a petition for a writ of habeas corpus, which the district court denied. The district court concluded that Hill had not overcome the highly deferential standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[2] *Hill v.*

---

[2]The district court was critical of the Ohio Court of Appeals opinion. Some of us agree with some of its observations. Here, however, we do not itemize the opinion's possible flaws in order to focus attention on our

*Anderson*, No. 4:96 CV 00795, 2014 WL 2890416, at *51 (N.D. Ohio June 25, 2014). The district court explained that while reasonable minds may disagree with the state court's determination and weighing of the evidence, the state court's "conclusion regarding Hill's adaptive behavior *at the time he filed his* Atkins *claim* was supported by sufficient credible evidence and, most importantly, the opinions of two experts." *Id.*

Hill appealed, and a panel of judges on this court reversed the district court's decision on Hill's *Atkins* claim. The panel found that "the state court judgment . . . amounted to an unreasonable application of the standard articulated by the Supreme Court in *Atkins* and as later explained by *Hall* and *Moore*."**[3]** *Hill v. Anderson*, 881 F.3d 483, 489 (6th Cir. 2018). In addition to his *Atkins* claim, Hill raised four other issues on appeal: an ineffective assistance of counsel claim related to his *Atkins* hearing, a *Miranda* claim, a claim of prosecutorial misconduct, and a due process claim based on the trial court's alleged failure to hold a pretrial competency hearing. *Id.* at 487. The panel pretermitted Hill's ineffective assistance of counsel claim and affirmed the district court's denial of the other three claims, which Hill has not challenged. *Id.* The Warden filed a petition for rehearing *en banc*, which was denied. He then filed a petition for a writ of certiorari, which the Supreme Court granted.

The Supreme Court vacated and remanded, finding that the panel's "reliance on *Moore* was plainly improper under § 2254(d)(1)." *Shoop v. Hill*, 139 S. Ct. 504, 505 (2019) (per curiam). The Court explained that "habeas relief may be granted only if the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of,' Supreme Court precedent that was 'clearly established' at the time of the adjudication." *Id.* at 506 (quoting 28 U.S.C. § 2254(d)(1)). Because *Moore* was decided after Hill's state-court proceedings, the Court found that the panel erred by relying on *Moore* when determining whether habeas relief was warranted under § 2254(d)(1). *Id.* at 508–09. The Court ordered that "[o]n remand, the [panel] should determine whether its conclusions can be sustained based strictly on legal rules that were clearly established in the decisions of this Court at the relevant

---

modest review role: that of determining whether the Ohio Court of Appeals unreasonably concluded that Hill was not intellectually disabled.

**[3]***See Hall v. Florida*, 572 U.S. 701 (2014); *Moore v. Texas*, 137 S. Ct. 1039 (2017).

time." *Id.* at 509. The Supreme Court did not directly comment on any other part of the panel's decision, including its analysis under § 2254(d)(2) or Hill's other four claims for relief. *See generally id.*

On remand, the panel again granted Hill relief on his *Atkins* claim. *Hill v. Anderson*, 960 F.3d 260, 265 (6th Cir. 2020) (per curiam). The panel also once again pretermitted Hill's ineffective assistance of counsel claim and affirmed the district court's denial of Hill's other three claims, incorporating its prior opinion in full. *Id.* at 265, 283.

The Warden filed a petition for rehearing *en banc* on Hill's *Atkins* claim, arguing that the panel erred under both § 2254(d)(1) and § 2254(d)(2). This court granted *en banc* review, which vacated the prior panel decision. Because we conclude that Hill's *Atkins* claim does not satisfy the demanding AEDPA standard, we affirm the district court's denial of habeas relief. In addition to our discussion of his *Atkins* claim, we find that Hill's ineffective assistance of counsel claim fails on its merits. We also reinstate the panel's prior discussion affirming the district court's denial of Hill's remaining claims to the extent it is consistent with this opinion.

II.

Under 28 U.S.C. § 2254(d)(1), a federal court may grant a writ of habeas corpus if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Objective unreasonableness is a higher standard than clear error. *See White v. Woodall*, 572 U.S. 415, 419 (2014). To demonstrate that the state court's decision was objectively unreasonable, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." *Id.* at 419–20 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A federal court may grant a writ under 28 U.S.C. § 2254(d)(2) if the state court proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under AEDPA, the question for this court to answer "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). Furthermore, "the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). Factual findings made by the state courts based on the trial record are entitled to a presumption of correctness that may be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren v. Smith,* 161 F.3d 358, 360–61 (6th Cir. 1998).

This "highly deferential standard" requires that determinations made in state court "be given the benefit of the doubt." *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002) *(per curiam)). When applying AEDPA, this court considers* "the decision of 'the last state court to issue a reasoned opinion on the issue[s]' raised in [the] habeas petition." *Shimel v. Warren*, 838 F.3d 685, 696 (6th Cir. 2016) (first alteration in original) (quoting *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006)). Here, that is the Ohio Court of Appeals decision. *See State v. Hill*, 894 N.E.2d at 108.

III.

A.

1.

While Hill's *en banc* supplemental brief only asserts a claim for relief under § 2254(d)(2), in his original appeal Hill also argued that he is entitled to relief under § 2254(d)(1). Specifically, Hill claimed that the state court's decision to evaluate whether Hill

was intellectually disabled at the time of his *Atkins* hearing rather than at the time the crime was committed was an unreasonable application of clearly established federal law.[4]

At the time of the Ohio Court of Appeals decision, the only clearly established Supreme Court precedent was *Atkins* itself.[5] *Atkins* held that the execution of intellectually disabled individuals violated the Eighth Amendment, but it did not provide a "comprehensive definition of 'mental retardation' for Eighth Amendment purposes." *Shoop*, 139 S. Ct. at 507. Instead, *Atkins* delegated to the states "the task of developing appropriate ways to enforce the constitutional restriction." *Atkins*, 536 U.S. at 317 (quoting *Ford*, 477 U.S. at 416). *Atkins* did not, as the Warden appears to claim, relinquish all standard-making authority to the states. *Atkins* set out several guideposts for the states' discretion by relying heavily on clinical definitions of intellectual disability and factors such as "subaverage intellectual functioning" and "significant limitations in adaptive skills . . . that became manifest before age 18." *Atkins*, 536 U.S. at 318.

Though *Atkins* took note of "standard definitions of mental retardation," the Court "did not definitively resolve how" those definitions "w[ere] to be evaluated but instead left [their] application in the first instance to the States." *Shoop*, 139 S. Ct. at 508; *see Bobby v. Bies*, 556 U.S. 825, 831 (2009) (explaining that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so

---

[4]It is unclear whether Hill has waived this argument. In the district court, Hill argued that "[t]o the extent that the state procedures themselves used to render the factual findings of the mental retardation clinical components contributed to and fostered inaccurate and unreliable factfinding by the trial court, the procedures violated clearly established federal law." DE 94, Petition, Page ID 148. Read in the light most favorable to Hill, Hill's current argument that the Ohio Court of Appeals focused its inquiry on the incorrect time period may be construed as one of the state procedures that Hill claimed before the district court contributed to inaccurate and unreliable factual findings. Given the ambiguity, and because neither party raised the potential waiver issue, we will proceed under the assumption that Hill's argument has not been waived.

[5]The Warden and twelve states as amici urge us to take this opportunity to overrule a line of Sixth Circuit precedent which permits courts to rely on clearly established law from both the United States Supreme Court and state supreme courts when considering an *Atkins* claim under § 2254(d)(1). *See* CA 6 R. 369, Response Br., at 14; CA 6 R. 371, Amicus Br., at 6; *see also Williams v. Mitchell*, 792 F.3d 606, 612 (6th Cir. 2015) ("[I]n the *Atkins* context, 'clearly established governing law' refers to the Supreme Court decisions and controlling state law decisions applying *Atkins*.") However, Hill does not attempt to rely on state court precedent to establish his § 2254(d)(1) claim. *See* CA 6 R. 375, Reply Br., at 7 n.2 ("The amicus brief filed on behalf of various states . . . focuses solely on a 2254(d)(1) argument that petitioner does not raise."). Because Hill does not present this issue to us, it is extraneous to this appeal, and we decline to resolve it here. *See United States v. Asakevich*, 810 F.3d 418, 421 (6th Cir. 2016) ("The federal courts have no license to issue advisory opinions . . . .").

impaired as to fall within *Atkins'* compass" (internal quotations omitted) (alteration adopted)). Therefore, Hill faces the difficult task of showing that the Ohio Court of Appeals applied the highly general holding of *Atkins* in an objectively unreasonable way. *Cf. Parker v. Matthews*, 567 U.S. 37, 49 (2012) (finding no unreasonable application of the "highly generalized standard for evaluating claims of prosecutorial misconduct"); *Lockyer*, 538 U.S. at 73, 76 (finding no unreasonable application of clearly established federal law when the "precise contours" of the constitutional standard at issue were "unclear" (internal quotations omitted)).

While it is possible for state courts to unreasonably apply *Atkins*, evaluating a defendant's intellectual abilities at a later date rather than at the time of the crime is not an unreasonable application of *Atkins*. *Atkins* does not define the time period when the inquiry must be made. Hill argues that because the Court in *Atkins* "list[ed] several common characteristics of those with intellectual disability . . . it contemplated their diminished culpability" which is "a reference to the time the crime was committed. Thus, any assessment of a criminal defendant's intellectual function must derive from that same moment in time." CA 6 R. 295, Petition, at 50. Hill's interpretation of *Atkins*, however, is hardly the only reasonable interpretation. As this court has previously explained, *Atkins* supports the conclusion that intellectual disability is not a transient condition. *See Williams*, 792 F.3d at 619 (concluding that "if an individual is indeed presently intellectually disabled, . . . the disability would have manifested itself before the individual turned eighteen" and "past evidence of intellectual disability . . . is relevant to an analysis of an individual's present intellectual functioning" (emphasis omitted)); *see also id.* at 626 (Gibbons, J., concurring) ("It is clear from the entire thrust of the *Atkins* decision—along with the medical literature that it cites in support—that intellectual disability is a permanent condition."); *Heller v. Doe,* 509 U.S. 312, 323 (1993) (noting, in a different context, that intellectual disability "is a permanent, relatively static condition" (citing S. Brakel et al., The Mentally Disabled and the Law 37 (3d ed. 1985))). If intellectual disability is not a transient condition, then the outcome should not change if the court evaluates a defendant's abilities at the time of the crime or at the time of a later *Atkins* hearing. Thus, we find Hill's argument that *Atkins* requires evaluating a defendant's intellectual abilities at the time of the offense to be unpersuasive.

Here, the Ohio Court of Appeals did not question the trial court's decision to evaluate Hill's intellectual abilities at the time of the *Atkins* proceedings rather than when the crime was committed. Nevertheless, the Ohio court considered evidence of Hill's past abilities including Hill's medical history, public school records, and prior standardized test results. *State v. Hill*, 894 N.E.2d at 123–24. The court also evaluated criteria mentioned in *Atkins* such as intellectual functioning, adaptive skills, and the onset age of disability. We cannot say that the Ohio court's decision was objectively unreasonable given the discretion *Atkins* left to the states.

2.

Next, Hill argues that the Ohio Court of Appeals decision was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, in violation of 28 U.S.C. § 2254(d)(2). Specifically, Hill claims that the state court mischaracterized the record, improperly discounted historical evidence, and unreasonably concluded that Hill failed to establish that his disability manifested before age 18. The Warden argues that the state court's decision was not unreasonable because the court relied on the opinions of two experts and because the court properly evaluated the evidence in the record. We conclude that the Ohio Court of Appeals decision was not based on an unreasonable determination of the facts.

Under Ohio law at the time of Hill's *Atkins* hearing, a defendant had to prove three factors to establish that he was intellectually disabled: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, . . . and (3) onset before the age of 18."[6] *Lott*, 779 N.E.2d at 1014. While courts are to conduct an independent review of the evidence presented, they "should rely on professional evaluations of [the defendant's] mental status, and consider expert testimony." *Id.* at 1015. Both parties agree that Hill satisfied the first factor, that he had significantly subaverage intellectual functioning. The Warden also admits that any adaptive deficits that Hill does have arose before he turned 18. Thus, the only remaining dispute is whether the Ohio Court of Appeals reasonably determined that Hill failed to prove the second *Lott* factor—"significant limitations in two or more adaptive skills, such as

---

[6]*Lott* has since been overruled, *see Ford*, 140 N.E.3d at 654–55, but it was the controlling state law at the time of the Ohio Court of Appeals decision.

communication, self-care, and self-direction." *Lott*, 779 N.E.2d at 1014; *see also Hill v. Anderson*, 2014 WL 2890416, at *22.

As an initial matter, the Warden argues that the Ohio Court of Appeals opinion is per se reasonable because two experts concluded that Hill did not have significant adaptive deficits. CA 6 R. 369, Response Br., at 11–12, 17 (citing *O'Neal v. Bagley*, 743 F.3d 1010, 1023 (6th Cir. 2013); *Carter v. Bogan*, 900 F.3d 754, 771 (6th Cir. 2018); *Apelt v. Ryan*, 878 F.3d 800, 837 (9th Cir. 2017); *Larry v. Branker*, 552 F.3d 356, 370 (4th Cir. 2009)). None of the four cases cited by the Warden, however, suggests such a per se rule. Instead, the court in each case based its conclusion on the content of the expert testimony and overall evidence before it. *See O'Neal*, 743 F.3d at 1023 ("With expert testimony split, . . . we cannot say from this vantage that [the state court decision to credit two experts over another] was unreasonable . . . ."); *Carter*, 900 F.3d at 771; *Apelt*, 878 F.3d at 837; *Larry*, 552 F.3d at 370. The Warden claims that "[w]hen a credible expert conducts an analysis—and when the defendant failed to put on evidence contradicting that analysis beyond reasonable debate—it is not *unreasonable* for the trial court to rely on that expert testimony." CA 6 R. 369, Response Br., at 17. But that statement itself is inconsistent with a per se rule. A per se rule would eliminate the need to ask whether the defendant "put on evidence contradicting [the] analysis [of the state's experts] beyond reasonable debate." CA 6 R. 369, Response Br., at 17; *cf. Rice v. Collins*, 546 U.S. 333, 341–42 (2006). Accordingly, this court must consider whether, based on the evidence presented, the Ohio Court of Appeals's determination that Hill did not suffer from significant limitations in two or more adaptive skills was unreasonable.

Our resolution of this case turns on the Ohio Court of Appeals consideration of the expert testimony presented at the *Atkins* hearing. Nevertheless, we outline the Court of Appeals's analysis in some detail before turning to the expert opinions, following the order in which the state appellate court considered various portions of the factual record.

The Ohio Court of Appeals began its review of the record by analyzing the standardized adaptive behavior tests performed on Hill at various stages of his life.[7] *State v. Hill*, 894 N.E.2d at 122. First, the court noted that the three experts assigned to evaluate Hill's ability at the time of the *Atkins* hearing—Drs. Hammer, Olley, and Huntsman—could not obtain "reliable [standardized test] results . . . on account of Hill's lack of effort." *Id.* The court considered standardized adaptive behavior tests Hill had completed in the past but concluded that they were unreliable because the methods used had later been discredited. *Id.* at 122–23. A voluminous 6,000 page record contains reports from Hill's teachers, school psychologists, medical experts, and prison officials about Hill's adaptive abilities. *See Hill v. Anderson*, 2014 WL 2890416, at *24.

The Ohio Court of Appeals next separated this factual record into four categories of largely anecdotal evidence: public school records, reports around the time of the trial for the killing of Raymond Fife, records from Hill's time in prison, and Hill's appearances before the trial court itself. *State v. Hill*, 894 N.E.2d at 124–25. After summarizing each category and considering the expert opinions, the court found that Hill had not met the second *Lott* factor. *Id.* at 126.

First, the Ohio Court of Appeals considered Hill's school records. *Id.* at 124. In one paragraph, the court stated:

> Hill's public school records amply demonstrate a history of academic underachievement and behavioral problems. Hill is often described as a lazy, manipulative, and sometimes violent youth. Although there are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone. Hill knew how to write and was described by at least one of his special education teachers as "a bright, perceptive boy with high reasoning ability."

*Id.*

---

[7]The Ohio Court of Appeals reviewed the trial court's decision for abuse of discretion and stated that the trial court must be affirmed if its decision is supported by competent and credible evidence. *State v. Hill*, 894 N.E.2d at 121.

This characterization of Hill's school records represents a short summary of the records. There are multiple accounts in Hill's records of his lying, stealing, and struggling to interact appropriately with his peers. *See, e.g.*, DE 97, Supp. Appendix, Page 530 ("Lying needs to be confronted."); *id.* at Page 568 ("Danny often manipulates the truth to his own advantage."); *id.* at Page 584 (describing an incident where Hill stole money from teachers' wallets); *id.* at Page 558 (listing one of Hill's annual goals when he was twelve as "improve peer-group relations"). Hill's behavioral problems, however, do not necessarily correlate with an absence of intellectual disability. *See Atkins*, 536 U.S. at 306 ("Because of their disabilities in areas of reasoning, judgment, and control of their impulses . . . [intellectually disabled individuals] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."). Each of the three experts who testified at Hill's *Atkins* proceeding agreed that Hill's behavioral problems during childhood did not necessarily contradict a finding of significant adaptive limitations. In addition to the accounts of behavioral problems, multiple evaluators also reported that Hill attempted to follow instructions and behaved well, particularly when dealing with adults. *See, e.g.*, DE 97, Supp. Appendix, Page 513 (school psychologist reported that, when given a test, Hill "did cooperate and accepted all tasks presented to him."); *id.* at Page 524 (court liaison officer describing Hill as a "personable black child who has good rapport with staff as well as the other residents" in a group home where he was placed when he was sixteen); *id.* at Page 568 ("Danny is a very affectionate child. He often expresses the desire to be hugged and will often rest his head on the teachers shoulder.").

Hill's school records suggest that he struggled academically as a child. *See, e.g.*, DE 97, Supp. Appendix, Page 515 (reporting that at age thirteen Hill's relative weaknesses included "not being able to recall everyday information, do abstract thinking, perform mental arithmetic, perceive a total social situation, perceive patterns, and to reproduce symbols using psychomotor speed and coordination"); *id.* at Page 569 (describing how at age thirteen, Hill was working on spelling words with more than four letters, learning to tell time, "ha[d] just begun working on subtraction," and "[w]hen given sentences, he [could] write them with assistance"); *id.* at Page 594 (listing one of Hill's goals for ninth grade as being able to "read a one page story and . . . answer comprehension questions with 80% accuracy").

There is also evidence that Hill needed reminders to perform basic personal hygiene and lacked self-direction.  *See, e.g.*, *id.* at Page 511 (describing one of Hill's weaknesses as "self-direction"); *id.* at Page 524 ("[Hill] needs constant reminder to shower, brush his teeth, etc., [but] he does attempt to do a [more] thorough job than when he first came to the program."); *id.* at Page 578 (reporting that Hill was still learning "to shower[] regularly, use[] deodorant regularly, [and] maintain[] a neat appearance" at the age of fourteen); *id.* at Page 575 (listing one of Hill's goals for ninth grade as being able to "learn to maintain[] a clean, neat, appearance" throughout the day).  All of this additional evidence, not included in the Court of Appeals summary, may be relevant to determining whether Hill had significant limitations in two or more adaptive skills.

Second, the Ohio Court of Appeals considered Hill's conduct during the time period surrounding the trial for the killing of Fife:

> *Hill's Trial for the Murder of Raymond Fife.*  The trial court observed that the record of Hill's murder trial provided evidence of Hill's ability concerning self-direction and self-preservation.  In particular, the court noted Hill's initiative in coming to the police in order to misdirect the focus of the investigation by implicating others and Hill's ability to adapt his alibi to changing circumstances in the course of police interrogation.  This last point was also noted by Dr. Olley in his hearing testimony: Hill "stood his ground during that interrogation very, very strongly.  * * * He not only modified his story a little bit when he was faced with evidence that couldn't possibly have avoided.  * * * That to me is a kind of thinking and planning and integrating complex information that is a higher level than I have seen people with mental retardation able to do."

*State v. Hill*, 894 N.E.2d at 124 (alterations in original).

In looking at the evidence, it is unclear that Hill's conduct demonstrated self-direction or self-preservation.  As the district court explained, under the prevailing medical guidelines at the time, self-direction was defined as:

> skills related to making choices; learning and following a schedule; initiating activities appropriate to the setting, conditions, schedule, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems confronted in familiar and novel situations; and demonstrating appropriate assertiveness and self-advocacy skills.

*Hill v. Anderson*, 2014 WL 2890416, at *33 (quoting AAMR 1992 Manual, 40).  While the trial court's assessment of Hill's conduct is one reasonable interpretation, a reasonable person might

also interpret Hill's conduct as evidence of a lack of self-direction.  For example, before Hill came forward to the police with information about the crime, the police were not pursuing Hill.  Thus, coming forward does not necessarily demonstrate appropriate self-advocacy skills since it drew more attention to Hill and linked him to the crime.  But faced with two reasonable interpretations of evidence, we cannot say that the state court's decision to go with one over the other was unreasonable.

The Ohio Court of Appeals does not mention the testimony of three experts—Dr. Douglas Darnall, Dr. Nancy Schmidtgoessling, and Dr. Douglas Crush—who found that Hill was intellectually disabled at the time of the 1986 trial, *see Hill*, 595 N.E.2d at 901, though the court recognized that "several of the experts pointed out . . . [that Hill] knew right from wrong," *Hill*, 894 N.E.2d at 118 (quoting *Hill*, 595 N.E.2d at 901).  On direct appeal, the Ohio Supreme Court accepted these experts' conclusion that Hill was intellectually disabled.  *Hill*, 595 N.E.2d at 901.  Although the experts at the mitigation stage were not using the definition of intellectual disability that was later articulated in *Lott* and *Atkins*, their testimony focused on similar characteristics such as Hill's intelligence level and adaptive skills, including whether Hill was a follower or a leader and whether he acted appropriately in different situations.  *See, e.g.*, *id.* (describing Hill's moral development as "'primitive,' a level at which 'one do[es] things based on whether you think you'll get caught or whether it feels good.  [T]hat's essentially whereabout [*sic*] a 2-year old is.'" (alterations in original)).  Failure to grapple with the expert reports from the time of the Fife trial that found Hill to be intellectually disabled is concerning, particularly given *Lott*'s direction that courts should rely on professional evaluations of the defendant's mental state.  *Lott*, 779 N.E.2d at 1015.

Third, the Ohio Court of Appeals examined the records from Hill's time on death row:

*Death Row Records.*  At the time of the evidentiary hearing, Hill had been incarcerated on death row for 20 years.  From this period of time, the trial court considered audiotaped interviews of Hill by Warren's Tribune Chronicle reporter Andrew Gray in the year 2000.  These interviews were arranged on Hill's initiative in order to generate publicity for his case.  The trial court found Hill's performance on these tapes demonstrated a high level of functional ability with respect to Hill's use of language and vocabulary, understanding of legal processes, ability to read and write, and ability to reason independently.

> The trial court considered the evidence of the various prison officials who testified at the evidentiary hearing. These witnesses consistently testified that Hill was an "average" prisoner with respect to his abilities in comparison with other death row inmates. They testified that Hill interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules. Prison officials offered further testimony in their interviews with the expert psychologists. One official opined that Hill began to behave differently after *Atkins* was decided, and he believed that Hill was "playing a game" to make others think he is retarded. Another official reported that Hill's self-care was "poor but not terrible" and that Hill had to be reminded sometimes about his hygiene.

*Hill*, 894 N.E.2d at 124–25.

While Hill's conduct in prison is relevant to an analysis of his adaptive skills, his time incarcerated may be an imperfect indicator of his functional abilities. Both Dr. Olley and Dr. Huntsman, who later concluded that Hill was not intellectually disabled, conceded that Hill's conduct in the highly-regulated prison environment was not a good indicator of his adaptive skills. Some courts have also discounted prison records, reasoning that they provide little insight into how the defendant would function in the general community. *See Hill v. Anderson*, 2014 WL 2890416, at *42 (collecting cases).

Additionally, Hill's prison record is not neat. Describing Hill as an average death row inmate is ambiguous without additional context about the average inmate's adaptive functioning level, particularly if some inmates, such as Hill, had been committed to death row before *Atkins* was decided. Prison officials are also not trained to diagnose intellectual disability, and, as the district court explained in detail, there were multiple inconsistencies within the prison employees' reports. *See Hill v. Anderson*, 2014 WL 2890416, at *43–44. The Ohio Court of Appeals, however, accurately described the accounts of some prison officials who reported that Hill did not appear to have significant limitations functioning on death row. *See, e.g.*, DE 97, Atkins Hr'g Tr., Page 787–89 (Hill did not need special accommodations to perform his prison job); *id.* at Page 793 (Hill would inform the prison staff when he had a medical problem); *id.* at Page 815 ("[Hill was] slow when he want[ed] to be slow.").

Fourth, the Ohio Court of Appeals considered the trial court's conclusion that "as a lay observer, [he] did not perceive anything about Hill's conduct or demeanor [during the court

proceedings] suggesting that he suffers from mental retardation." *Hill*, 894 N.E.2d at 125. While the Ohio Court of Appeals conceded that trial courts should not rely solely on their own perception of the defendant in court to determine whether the defendant is intellectually disabled, the Ohio Court of Appeals still utilized the trial court's perception here because it aligned with the conclusions of two experts. *Id.* at 125–26.

The last, and most important, type of evidence the Ohio Court of Appeals considered was the opinions of three medical experts who evaluated Hill in preparation for the *Atkins* hearing: Dr. Hammer (selected by Hill), Dr. Olley (selected by the prosecution), and Dr. Huntsman (selected by the court). *State v. Hill*, 894 N.E.2d at 113. All three experts relied on a comprehensive record of Hill's history, including his past medical reports, school records, transcripts and videos from the time of the Fife trial, accounts from prison officials, and their own evaluation of Hill. Dr. Hammer concluded that Hill was intellectually disabled, and Drs. Olley and Huntsman found that he was not. The Ohio Court of Appeals described Drs. Olley's and Huntsman's findings in detail. *Id.* at 125.

Dr. Hammer was licensed to practice psychology in the state of Ohio and was the director of psychology services at the Nisonger Center at the Ohio State University. During his career, he had specialized in behavioral pediatrics, which included working with children, adolescents, and adults with intellectual disabilities. As part of his evaluation, Dr. Hammer reviewed an extensive list of Hill's relevant history including evaluations from school officials, transcripts from Hill's past court proceedings, and prison records. Hammer concluded that "[o]verall, these records provide an extensive and consistent documentation that Mr. Hill has demonstrated, from an early age, sufficient intellectual and adaptive behavior deficits to qualify for a diagnosis of Mild Mental Retardation." DE 97, Supp. Appendix, Page 1110. Hammer noted that "the records also indicate that [Hill] was generally regarded as mentally retarded by nearly all the psychological, psychiatric, educational, and youth authority professionals he encountered over the years." *Id.*

Hammer, along with Olley and Huntsman, interviewed Hill himself. The three doctors performed a series of tests to evaluate Hill's intellectual abilities but could not complete the testing. *Id.* at Page 1111–12. Hammer reported that Hill "appeared to be quite disinterested and unmotivated" during some of the testing but was unable to determine whether Hill "was trying to

deliberately do poorly on the test or whether the significant cognitive demands of the test, especially following the extensive demands of [previous testing] may have caused him to give up and shut down." *Id.* at Page 1111. However, Hammer also testified at the *Atkins* hearing that all three experts "agreed that [Hill] was trying to fake bad." DE 97, Atkins Hr'g Tr., Page 264. Because of the difficulties with testing and the inability to measure several adaptive abilities in a prison setting, "all three psychologists agreed that an independent, valid standardized adaptive behavior instrument could not be completed for Mr. Hill." DE 97, Supp. Appendix, Page 1112.

In his report, Hammer weighed the opinions of prison officials who interacted with Hill. Hammer concluded that the officials' descriptions of Hill:

> [W]ere relatively consistent in describing Mr. Hill across some areas (e.g., average compared to other inmates, helping others, no 'falling out' episodes) and strikingly discrepant in others (e.g., energy level, getting along with other inmates, hygiene and self-care problems.) Overall, the description of Mr. Hill's adaptive and social behavior on Death Row was not inconsistent with that of a person with mild mental retardation and conduct problems and it was not generally contradictory of information in Mr. Hill's historical records.

*Id.* at Page 1115. In conclusion, Hammer found that "records, observations and interviews indicate adaptive behavior functioning consistent with the Mild Retardation range" and concluded that Hill had "significant deficits in functional academic, social-emotional functioning, self-care and work habits over the years." *Id.* at Page 1116–17.

Like Hammer, Dr. Olley was a licensed psychologist who specialized in working with individuals who have intellectual disabilities. He had previously testified on behalf of a defendant in nine other capital cases involving claims of intellectual disability. When making his evaluation, Olley considered Hill's historical records including evaluations performed at school, evidence from around the time of the Fife trial, and interviews with Hill and prison officials. Olley testified that "this [was] the most thorough evaluation of a death row inmate that [he] ha[d] been involved with." DE 97, Atkins Hr'g Tr., Page 773. Unlike Hammer, Olley concluded that "[r]ecords regarding Mr. Hill's adaptive behavior before age 18 [were] less extensive." DE 97, Supp. Appendix., Page 1119. But Olley acknowledged that Hill had undergone two formal adaptive behavior tests during childhood, one "yield[ing] a score in the average range, and another yield[ing] a score in the range of mild mental retardation." *Id.* at

Page 1119. Olley stated that Hill "had consistently low academic performance," and his "records indicate significant behavior problems from an early age and a history of lying." *Id.*

Olley also analyzed more recent evidence of Hill's intellectual abilities. He emphasized Hill's latest court appearance where he showed his "ability to orally express his claim of innocence" and "used vocabulary and sentence structure and complex reasoning that, in [Olley's] opinion, indicate[d] intellectual ability above the level of mental retardation." *Id.* Olley testified that "the way that Mr. Hill presents himself in his language, in his arguing on his own behalf and his assertiveness about his case is substantially more sophisticated than any of the other defendants with whom [he] ha[d] worked."[8] DE 97, Atkins Hr'g Tr., Page 1763. Like Hammer, Olley also interviewed several prison employees and compared their descriptions of Hill against Hill's own description of his abilities. In general, the prison officials reported that Hill had a higher adaptive capability than Hill reported having himself, which Olley stated "further support[ed] the conclusion that Mr. Hill tried to portray himself as having mental retardation." DE 97, Supp. Appendix., Page 1125. In sum, Olley held that there was "[t]oo little information . . . available about adaptive behavior in childhood to make a confident retrospective diagnosis of mental retardation" and that "[t]he available information on Mr. Hill's current functioning [did] not allow a diagnosis of mental retardation." *Id.* at Page 1124–25; *see also* DE 97, Atkins Hr'g Tr., Page 1785 (testifying that "this hits me between the eyeballs that this is not a man with mental retardation").

The third expert to testify at Hill's *Atkins* proceeding was Dr. Huntsman. Unlike Hammer and Olley, Huntsman's work focused on diagnosing defendants who suffered from serious mental disorders rather than intellectual disabilities. She had limited experience working with defendants who had intellectual disabilities and had only administered an adaptive-skills test a handful of times, the last time being several years before Hill's *Atkins* hearing. *Id.* at Page 980–81, 992. Like Hammer and Olley, Huntsman considered Hill's past school records,

---

[8]Hammer testified that sometimes individuals with intellectual disabilities will learn "sort of scripts or scenarios that they can kind of pull out and go through when they encounter a situation" to make it appear that they are more competent or well-spoken than they truly are. DE 97, Atkins Hr'g Tr., Page 192–93. Olley, however, did not address this cloak-of-competency theory, and Hammer himself did not verify that Hill was attempting to don a "cloak of competence" when speaking about his past conduct, *see* DE 97, Atkins Hr'g Tr., Page 191–93.

evidence from around the time of the Fife trial, and contemporary evidence when assessing Hill's intellectual abilities.

Huntsman concluded that Hill fell in the "[b]orderline" range of intellectual functioning and his "level of adaptive behavior certainly exceeds the level expected of a mildly mentally retarded individual." DE 97, Supp. Appendix., Page 1140–41. Huntsman stated that "in many respects [the] most persuasive[]" evidence was the prison officials' "consistent descriptions of [Hill] as 'average' within the death row population at Mansfield." *Id.* at Page 1141. Huntsman, however, testified that it was difficult to assess adaptive behaviors in the prison setting. And as we previously explained, describing Hill as the "average" inmate is ambiguous without additional context. Huntsman also appears to have relied heavily on her own conversations with Hill, where she said Hill "demonstrated a remarkable memory for the history of his case." DE 97, Supp. Appendix., Page 1141. She emphasized that she believed Hill was malingering during standardized testing, trying "to appear less competent than he is." *Id.* at Page 1140. Huntsman concluded that in her opinion, "when one takes both his probable performance on the formal assessment of I.Q. and his level of adaptive behavior into account, [Hill's] overall level of intellectual functioning falls within the borderline range" rather than intellectually disabled. *Id.* at Page 1141.

Olley and Huntsman focused on whether Hill was intellectually disabled at the time of the evaluation rather than at the time of the Fife trial or during his childhood. *See* DE 97, Supp. Appendix, Page 1125 (Dr. Olley opining that "[t]he available information on Mr. Hill's current functioning does not allow a diagnosis of mental retardation."). Both, however, grappled with the historical evidence of Hill's intellectual functioning and reviewed records from Hill's childhood when making their determinations.

Olley testified that "[b]ased upon the available information," including records from Hill's time in school, it was his opinion that "Hill did not have mental retardation *at the time of the offense*." DE 97, Atkins Hr'g Tr., Page 779 (emphasis added). Olley did not dismiss Hill's past anecdotal evidence; rather, he concluded after reviewing the record that "there was inadequate information about adaptive behavior that would allow [him] to conclude that there was a significant impairment in adaptive behavior" at the time of the offense. *Id.* at Page 780.

Olley explained that while there were numerous IQ tests from Hill's childhood that satisfied the first requirement of *Lott*, there was insufficient evidence to find that Hill had significant adaptive deficits. *Id.* at Page 783. Olley testified that Hill "certainly did function low in academic skills" but that none of the four formal evaluations Hill had taken during childhood "confirmed adaptive behavior overall at a significantly subaverage level" and the "[o]ther information was anecdotal." *Id.* Huntsman also testified that she thought Hill probably was not intellectually disabled at the time of the offense. *Id.* at Page 1051. When making her assessment, Huntsman weighed Hill's past records including formal testing done by psychologists and the evaluations done by school officials. *Id.* at Page 1046–50. She explained that she gave less weight to school assessments because they "were being done for a very different purpose," namely to create educational interventions rather than determine whether Hill was intellectually disabled under clinical guidelines. *Id.* at Page 1046. Both doctors weighed the available evidence of Hill's past and present adaptive abilities when reaching their conclusions.

In view of this expert testimony, the Ohio Court of Appeals reasonably concluded that Hill is not intellectually disabled. Three credentialed and independent physicians met with Hill, thoroughly reviewed the evidence—including records dating back to Hill's childhood—and conveyed their findings in detailed reports. Two of those experts found that Hill is not intellectually disabled.

In conclusion, the Ohio Court of Appeals did not act unreasonably in relying on the opinions of Olley and Huntsman, trained medical professionals who had full access to the extensive record in this case. The question before us is narrow, and the AEDPA standard is demanding. The law does not allow us to weigh the evidence according to a modern understanding of intellectual disability or to engage in de novo factfinding. To prevail, Hill must demonstrate that "in light of the evidence presented" before it, the Ohio Court of Appeals's determination that he did not have significant limitations in two or more adaptive skills was unreasonable. *Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Hill has not cleared this high hurdle.

Admittedly, there is evidence in the record that shows Hill has limitations in some adaptive skills such as self-care, functional academics, and self-direction. But there is also evidence that Hill's adaptive abilities were not as lacking as several of the anecdotal accounts suggest. Importantly, two medical experts, including Dr. Olley who had significant experience working with individuals with intellectual disabilities, concluded after looking at Hill's entire record that he did not have significant limitations in two or more adaptive skills, and, thus, was not intellectually disabled. In light of the evidence presented, it was not unreasonable for the Ohio Court of Appeals to rely on the reasoned judgment of two experts over another. *See O'Neal*, 743 F.3d at 1023; *see also Lott*, 779 N.E.2d at 1015 ("The trial court should rely on professional evaluations of [the defendant's] mental status, and consider expert testimony . . . in deciding this matter."). While another judge could have reasonably reached the opposite conclusion, the determination of the Ohio Court of Appeals was not unreasonable. Accordingly, Hill cannot succeed on his *Atkins* claim. The district court properly denied Hill relief under § 2254(d)(2).

B.

Hill's ineffective assistance of counsel claim also remains unresolved. In his first habeas petition after his *Atkins* hearing, Hill argued that his *Atkins* counsel provided ineffective assistance. The district court held that Hill's claim was barred by 28 U.S.C. § 2254(i) and failed on its merits. *Hill*, 2014 WL 2890416, at *53–57. The panel twice pretermitted the ineffective assistance of counsel claim after granting Hill relief on his *Atkins* claim, *Hill*, 881 F.3d at 487; *Hill*, 960 F.3d at 265, and the Supreme Court did not address the issue, *see Shoop*, 139 S. Ct. at 505–09. The Warden now asks this court to affirm the district court's dismissal of Hill's ineffective assistance of counsel claim under § 2254(i). While Hill does not present a full argument in his supplemental *en banc* briefing, he notes that "whether *Atkins* counsel provided ineffective assistance has not been fully adjudicated." CA 6 R. 362, Supp. Br., at 3 n.2. Because we find that Hill's claim fails on the merits, we affirm the district court.

As a preliminary matter, the parties dispute whether Hill's ineffective assistance of counsel claim is barred by § 2254(i), which provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground

for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). Hill argues that his claim is not barred by § 2254(i) because defendants like him, who were convicted before *Atkins* was decided have a constitutional right to counsel during their postconviction *Atkins* hearings. One circuit agrees with Hill, *see Hooks v. Workman*, 689 F.3d 1148, 1183–84 (10th Cir. 2012), and the Supreme Court has left open the possibility that a right to counsel exists during initial-review collateral proceedings, *see Martinez v. Ryan*, 566 U.S. 1, 8 (2012) (stating, without deciding, that "the Constitution may require States to provide counsel in initial-review collateral proceedings because 'in [these] cases . . . state collateral review is the first place a prisoner can present a challenge to his conviction'" (alteration and omission in original) (quoting *Coleman v. Thompson*, 501 U.S. 722, 755 (1991))). *But see Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (holding that the right to counsel generally does not extend to collateral proceedings); *Murray v. Giarratano*, 492 U.S. 1, 10 (1989) (plurality opinion) (applying *Finley* to capital cases); ); *id.* at 14 (Kennedy, J., concurring in the judgment) (agreeing that the Constitution does not require the appointment of counsel for capital defendants in state collateral proceedings). We need not address Hill's constitutional argument here, however, because even if Hill had a right to the effective assistance of post-conviction counsel during his *Atkins* proceedings, his *Atkins* counsel provided effective assistance. *See Hooks*, 689 F.3d at 1208 (Gorsuch, J., concurring in part and dissenting in part) ("Caution is always warranted when venturing down the road of deciding a weighty question of first impression and recognizing a previously unrecognized constitutional right. And surely caution must be doubly warranted when nothing turns on it.").

To prevail on his ineffective assistance of counsel claim, Hill must first "show that counsel's performance was deficient" by "an objective standard of reasonableness," meaning that his *Atkins* counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Second, the defendant must show that the deficient performance prejudiced the defense," meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at

687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Because the Ohio state courts did not address the potential ineffectiveness of Hill's *Atkins* counsel, AEDPA deference does not apply, and we review the district court's findings de novo. *Hill v. Mitchell*, 842 F.3d 910, 919–20 (6th Cir. 2016).[9]

Hill argues that his *Atkins* counsel's performance was deficient in four ways: (1) failing to object to the presence of James Teeple during Hill's psychological evaluation; (2) failing to properly investigate Hill's adaptive functioning with school officials, prison psychologists, family members, and death row inmates; (3) failing to object to the *Atkins* proceeding on competency grounds; and (4) failing to withdraw as counsel given his antagonistic relationship with Hill.

1.

First, Hill claims that his *Atkins* counsel, Gregory Meyers, was ineffective for failing to object to James Teeple's presence during Hill's psychological evaluation on April 26, 2004, with Drs. Hammer, Olley, and Huntsman. Teeple was one of the detectives who was involved in the initial 1985 investigation into Hill after the killing of Fife, and Hill wrongly believed that Teeple was part of a conspiracy to frame him for Fife's murder. Because Meyers was aware that Hill distrusted Teeple, Hill argues that Meyers should have objected to Teeple's presence during the evaluation after the trial court issued an order on April 15, 2004, stating, among other things, that Teeple would be present to record the April 26 evaluation.[10]

Assuming, without deciding, that Hill is correct that Meyers should have objected to Teeple's presence, Hill has not demonstrated prejudice. To establish prejudice Hill "must show a substantial, not just conceivable, likelihood of a different result." *Campbell v. Bradshaw*, 674 F.3d 578, 586 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Pinholster*, 563 U.S. at

---

[9]The Warden argues that Hill's claim is procedurally defaulted because he may have been able to raise a claim of ineffective assistance of *Atkins* counsel in state court. We decline to review this procedural question because Hill's claim fails on the merits. 28 U.S.C. § 2254(b)(2); *see also Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Cyars v. Hofbauer*, 383 F.3d 485, 486 n.1 (6th Cir. 2004) ("We need not delve into the morass of procedural bar, however, because Petitioner's claim fails on the merits even *assuming* he properly exhausted available state court remedies." (emphasis omitted)).

[10]In a rare misreading of the record, the district court incorrectly found that Meyers did not have notice that Teeple would be present at the April 26 evaluation. *Hill*, 2014 WL 2890416, at *57.

189). Both Drs. Huntsman and Olley acknowledged during 2011 depositions that the presence of the three medical experts and Teeple may have negatively impacted Hill's performance during the psychological testing. Hill argues that this calls into doubt the experts' determination that he intentionally performed poorly during testing. However, neither Olley nor Huntsman stated that they believed there is a substantial likelihood that their ultimate conclusion that Hill was not intellectual disabled would have been different if Teeple had not been present. Furthermore, neither expert could say that Teeple's presence on the first of three days of testing was the only possible cause for Hill's performance. For example, Huntsman acknowledged that she did not set a proper tone at the beginning of the evaluation and that could have influenced Hill's performance. While Teeple's presence may have made Hill uncomfortable during the first day of the psychological evaluation, Hill has not proven that there is a reasonable probability that the outcome of his *Atkins* proceeding would have been different had Meyers objected to Teeple videotaping the evaluation.

2.

Second, Hill argues that Meyers failed to investigate and fully prepare for the *Atkins* hearing because he only presented one witness, Dr. Hammer. Hill claims Meyers should have also presented testimony during the *Atkins* hearing from: (1) school psychologists Karen Weiselberg-Ross and Annette Campbell; (2) Dr. John Vermeulen, who evaluated Hill when he was incarcerated in 1986; (3) Dr. James Spindler, who evaluated Hill in 2000; (4) other death-row inmates; and (5) Hill's family members, including his mother. Hill argues that "[t]he failure to investigate the issue of [Hill's] mental retardation more thoroughly and to present these additional witnesses . . . was deficient performance by Meyers which prejudiced [Hill] beyond measure." CA 6 R. 295, Petition, 73.

Failure to reasonably investigate a defendant's background and medical history or present mitigating evidence may establish ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003). However, a counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*,

466 U.S. at 690–91. While counsel may be deficient for failing to investigate a "known and potentially important witness," *United States v. Arny*, 831 F.3d 725, 732 (6th Cir. 2016) (quoting *Towns v. Smith*, 395 F.3d 251, 259 (6th Cir. 2005) (quotation omitted)), a "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Meyers's decision to rely solely on Dr. Hammer's testimony and the factual record was a reasonable professional judgment. Medical expert testimony is key to determining whether a defendant is intellectually disabled under Ohio law. *See Lott*, 779 N.E.2d at 1015 ("The trial court should rely on professional evaluations of [the defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter."). A trial court "may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave." *State v. White*, 885 N.E.2d 905, 915 (Ohio 2008). Given the importance of medical testimony, Meyers's choice to focus on Hammer, an expert in intellectual disabilities, was reasonable. Hammer had reviewed Hill's past school records and medical evaluations as part of his evaluation process, which included reports from many of the individuals Hill argues Meyers should have called as witnesses. Because, as Hill concedes, Hammer's evaluation and testimony "w[ere] thorough and compelling in [their] own right," CA 6 R. 295, Petition, 73, Meyers had good reason to think that further investigation would be a waste. Meyers's decision not to continue the investigation was a reasonable professional judgment. Since Meyers's performance was not deficient, we need not address the prejudice prong of *Strickland*.

3.

Third, Hill argues that Meyers was deficient for failing to formally raise concerns about Hill's competency. In a preliminary hearing on April 15, 2004, Meyers told the court that he had "deep professional concerns about Mr. Hill's competence" because Hill was considering not continuing his *Atkins* claim. DE 97, Supp. Appendix, Page 1192. Hill claims that based on this one statement, Meyers should have petitioned the court to evaluate Hill's competency before proceeding. Hill does not point to any evidence beyond Meyers's statement, however, that suggests that he was incompetent at the time of his *Atkins* proceeding. Particularly given the fact

that Hill continued to pursue his *Atkins* claim after Meyers's statement on April 15, 2004, there is insufficient evidence to prove either that Meyers's decision not to file a motion to evaluate Hill's competency was deficient or to demonstrate that there was a reasonable probability that, had Hill been evaluated at that time, he would have been found incompetent.

4.

Finally, Hill claims that Meyers should have done more to withdraw as his attorney considering Hill's distrust of Meyers and the Office of the Ohio Public Defender ("OPD"). Hill had a "deep and abiding antipathy towards lawyers affiliated with the [OPD]," which began before Meyers agreed to represent Hill during his *Atkins* proceeding. DE 97, Supp. Appendix, Page 461, 464. Hill believed that the OPD had misrepresented him during his first, pre-*Atkins*, postconviction litigation and was suspicious of the OPD because his uncle, Morris Hill, who Hill believed had tried to wrongly frame him for the Fife murder while working as a police officer, was an OPD investigator during his *Atkins* proceeding. Hill was also unhappy that OPD attorneys would not pursue an actual innocence claim in conjunction with his *Atkins* proceeding. According to Meyers, these longstanding issues made it impossible for him to maintain a productive attorney-client relationship with Hill.

Hill argues that Meyers had a "duty to use any means available to get off the case" once he realized the severity of the breakdown in the attorney-client relationship. CA 6 R. 295, Petition, 95. The record demonstrates, however, that Meyers did use any means available to attempt to withdraw after his relationship with Hill deteriorated. Meyers submitted two written motions and one oral motion to withdraw as Hill's counsel. DE 97, Supp. Appendix, Page 461. In his second written motion, Meyers clearly asked to be removed as counsel because he believed Hill's misguided ideas that Meyers was conspiring against him had "utterly destroyed anything akin to an attorney-client relationship" and, in his professional opinion, "no viable attorney-client relationship exist[ed] between" himself and Hill. *Id.* at Page 467. Despite Meyers's appeals, the trial court denied his motions to withdraw as counsel, citing Meyers's experience as "probably the foremost capital jurisprudence public defender in the State of Ohio" and the complicated nature of Hill's case. *Id.* at 1178; *see also id.* at 1219–20 (finding no

conflict of interest with respect to Meyers's representation of Hill).**11** Hill has not demonstrated that Meyers was deficient for failing to bring a fourth motion to withdraw or that further attempts by Meyers would have affected the outcome of the proceeding given the trial court's consistent refusal to allow Meyers to withdraw.

Alternatively, Hill claims that Meyers should never have accepted the appointment to represent Hill in the first place because he knew that Hill had conflicts with the OPD during his trial and initial appeals. When questioned by the trial court, however, Meyers explained that he only agreed to represent Hill after carefully considering whether he could provide effective representation given Hill's past conflict with the OPD. Hill has not demonstrated that Meyers, who was not employed by the OPD during Hill's trial and first state postconviction appeal, should have realized before he filed his initial appearance that Hill's past disagreements with OPD lawyers could have prevented Meyers from developing a working attorney-client relationship with Hill. Additionally, Hill has not established a reasonable probability that the outcome of his *Atkins* proceeding would have been different had Meyers not entered his initial appearance. In sum, Hill's arguments that Meyers provided ineffective assistance of counsel are without merit. Accordingly, we affirm the district court's denial of his claim.

C.

Hill's remaining issues were correctly resolved in the panel's 2018 opinion, *see* 881 F.3d 483 (6th Cir. 2018), and we reinstate those portions of the opinion to the extent they are consistent with this opinion. For the convenience of the reader, they are attached as an appendix to this opinion.

---

**11**Hill appears to suggest that his right to counsel was violated by the district court's denial of Meyers's motions to withdraw. A trial court's "decision to deny a motion to withdraw or for substitute counsel is reviewed for abuse of discretion." *United States v. Powell*, 847 F.3d 760, 778 (6th Cir. 2017); *see also id.* ("Appellate courts reviewing the denial of such a motion generally consider four factors: 'the timeliness of the motion'; 'the adequacy of the court's inquiry into the matter'; 'the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense'; and 'the balancing of these factors with the public's interest in the prompt and efficient administration of justice.'" (quoting *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001)). Hill has not put forth any developed argument supporting his argument that the trial court's decision not to remove Meyers in this case was an abuse of discretion. Accordingly, Hill has waived this argument. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006).

-------------------

**DISSENT**

-------------------

KAREN NELSON MOORE, Circuit Judge, dissenting. Danny Hill asserts in his habeas petition that the State of Ohio may not execute him because he is intellectually disabled.[1] *See Atkins v. Virginia*, 536 U.S. 304 (2002). *Atkins*, the case that bars the execution of intellectually disabled defendants, was decided and made retroactive after Hill was convicted of murder and sentenced to death. Before *Atkins* was decided, Hill had been diagnosed as intellectually disabled approximately ten times over the course of his life, R. 97 [disc 1] (Suppl. App.) (Pages 61–76, 513–530, 592–621), including during the penalty phase of his trial when three psychological experts testified that Hill was intellectually disabled. *See State v. Hill*, Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27, 1989). The Ohio courts agreed, stating that Hill "suffers from some mental retardation" and is "mildly to moderately retarded." *See id.* at *6; *State v. Hill*, 595 N.E.2d 884, 901 (Ohio 1992) (discussing the experts' testimony). But ultimately, Hill was sentenced to death because all that his intellectual disability counted for at the time was a point in his favor in the sentencing calculation—not a bar to his execution. *See Hill*, 1989 WL 142761, at *4. When *Atkins* came down, our court issued a remand order directing the Ohio courts formally to assess Hill's intellectual functioning under *Atkins*. *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002). Even "[t]hough Ohio courts reviewing his case have concluded that Danny Hill is retarded, and voluminous expert testimony supported this conclusion," we issued a remand because Hill's *Atkins* claim "ha[d] not been exhausted or conceded." *Id.* (citations omitted). This time around, the Ohio courts decided that Hill was *not* intellectually disabled. *See State v. Hill*, 894 N.E.2d 108, 127 (Ohio Ct. App. 2008).

No person looking at this record could reasonably deny that Hill is intellectually disabled under *Atkins*. In holding otherwise, the Ohio courts avoided giving serious consideration to past evidence of Hill's intellectual disability. Doing so amounted to an unreasonable determination of the facts and an unreasonable application of even the general *Atkins* standard. Because *Atkins*

-------------------

[1] I will use the medical community's preferred term of "intellectually disabled" in place of "mentally retarded" except where the term is in quoted material.

and the record inescapably mandate, even under AEDPA deference, that Ohio cannot execute Hill due to his intellectual disability, I dissent.

## I. BACKGROUND

The facts and legal proceedings surrounding Hill's conviction and death sentence in 1986 are set out in an earlier opinion. *See Hill*, 300 F.3d at 680–81. Because this case centers on the issue of intellectual disability, what follows is an account of the facts and proceedings relevant to that question in this case.

Several evaluations conducted around the time of Hill's trial in 1986 reveal that Hill "has a diminished mental capacity," *Hill*, 1989 WL 142761, at *32, a fact acknowledged by the state court after Hill's *Atkins* hearing. *See Hill*, 894 N.E.2d at 112 (summarizing the testimony of the three experts who testified during the mitigation phase of the initial trial that Hill was mentally "retarded"). Hill's IQ at the time of trial ranged from 55 to 68, and his moral development was "primitive"—essentially that of a two-year-old. *Id*. There is no dispute that Hill's IQ is so low that he easily meets the first element of the clinical definition of intellectual disability.

Since his earliest days in school, Hill has struggled with academics. At the age of six, a school psychologist noted that Hill was "a slower learning child" and recommended that his teachers "make his work as concrete as possible" without "talking about abstract ideas." R. 97 [disc 1] (Suppl. App.) (Pages 489–91). After kindergarten, Hill was placed into special education classes for the remainder of his time in the public school system. R. 29 (Suppression Hr'g Tr.) (Page ID #3081–92).[2] Hill struggled to keep up academically even in his special education classes and had difficulty remembering even the simplest of instructions. R. 31 (Mitigation Hr'g Tr. at 173–74) (Page ID #3485–86).[3] At the age of thirteen, his academic and social skills were at a first-grade level. R. 97 [disc 1] (Suppl. App.) (Page 568). At the age of fifteen, Hill could barely read or write, and he was noted to have deficits in adaptive behavior, specifically in the areas of self-direction, socialization, and communication. R. 31 (Mitigation

---

[2]Because the pagination in the original transcript of the suppression hearing is unclear, I will cite the pagination used by the district court.

[3]The Mitigation Hearing Transcript can be found in the district court record at R. 31 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28, 1997).

Hr'g Tr. at 79–89) (Page ID #3391–401); R. 97 [disc 1] (Suppl. App.) (Pages 592–93). Those problems persist today.

Hill has also been unable to take care of his hygiene independently from a young age. During his time in a home for children with behavioral issues, Hill could not remember to comb his hair, brush his teeth, or take a shower without daily reminders. R. 31 (Mitigation Hr'g Tr. at 88) (Page ID #3400). Even in the highly structured environment of death row, Hill would not shower without reminders.

After receiving two convictions for rape at age seventeen, Hill was assessed for intellectual disability by the juvenile court. R. 97 [disc 1] (Suppl. App.) (Page 527). He was diagnosed as "mildly retarded" with very poor adaptive functioning. *Id.* at 527–28. Before *Atkins* was decided, Hill had been diagnosed as intellectually disabled approximately ten times over the course of his life. *Id.* at 61–76, 513–30, 592–621. During the mitigation phase of his trial for the Fife murder, the psychological experts and the Ohio courts decided that Hill was intellectually disabled and had significant adaptive deficits. *Hill*, 1989 WL 142761, at *6; *Hill*, 595 N.E.2d at 901. Nevertheless, the Ohio Supreme Court upheld his death sentence because it was then constitutional to execute intellectually disabled defendants. *See Hill*, 1989 WL 142761, at *4.

The Supreme Court decided *Atkins* in 2002 while Hill's appeal from the district court's denial of his habeas petition was pending before this court. We remanded the case to the district court with instructions to remand Hill's unexhausted *Atkins* claim to the state court and to stay the remaining claims pending resolution of the *Atkins* claim. *Hill*, 300 F.3d at 683. After the case was returned to the state court, three experts—Drs. David Hammer, J. Gregory Olley, and Nancy Huntsman—examined Hill and testified over the course of several evidentiary hearings on Hill's *Atkins* claim. Hill retained Dr. Hammer, Dr. Olley acted as the state's expert, and Dr. Huntsman was appointed by the trial court. Dr. Hammer concluded that Hill met all three prongs for a diagnosis of intellectual disability. However, Drs. Olley and Huntsman concluded that Hill was not intellectually disabled.

The state trial court denied Hill's petition for relief under *Atkins*, finding that Hill did not exhibit significant adaptive deficits and that any deficits that he did have did not manifest before the age of 18. *State v. Hill*, No. 85-CR-317 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Pages 3399–482)]. The Ohio Court of Appeals affirmed that decision, over a dissent, holding in the first instance that issue preclusion did not require a different result "because the finding that he was mentally retarded was not essential to the imposition of the death penalty in the same way that it is essential in the *Atkins/Lott* context." *Hill*, 894 N.E.2d at 116, 127. The Ohio Supreme Court declined to review the case, with two justices dissenting. *State v. Hill*, 912 N.E.2d 107 (Ohio 2009) (table).

With the conclusion of his state-court proceedings, Hill moved to reopen and amend his habeas petition in this case to include claims under *Atkins*. There is no dispute that Hill's IQ is so low (ranging from a low of 48 to a high of 71) that he easily meets the first element of the clinical definition of intellectual disability. The parties disagree, however, on the propriety of the state courts' holdings that Hill did not exhibit sufficient adaptive deficits (the second element).[4] Thus, the issue before us is whether it was unreasonable for the Ohio courts to decide that Hill did not exhibit significant adaptive deficits.

## II. STANDARD OF REVIEW

In his opening brief, Hill argued that we should review the state courts' determinations on adaptive deficits as both legal and factual conclusions under 28 U.S.C. § 2254(d)(1) and (2). *See* Hill Opening Br. at 34 ("The state courts' application of the law and the determination of the facts were unreasonable, and therefore habeas relief is warranted under 28 U.S.C. § 2254(d)(1) and (2)."). That would mean that we ask whether, under § 2254(d)(1), those decisions amount to an unreasonable application of *Atkins* and whether, under §§ 2254(d)(2) and 2254(e)(1), there is clear and convincing evidence that the state courts' findings amounted to an unreasonable determination of the facts.

---

[4]The Warden concedes that Hill's "adaptive deficits (the second element) arose before age eighteen (the third element) if they arose at all." Warden Supp. En Banc Br. at 16.

I agree with Hill that the state courts' determination on adaptive deficits should be analyzed as both legal and factual conclusions under § 2254(d)(1) and (2). Hill's arguments attack the reliability of the state courts' determination of the facts and their interpretation of *Atkins*. But, at the same time, his case partly turns on what a court must consider under *Atkins* in testing for intellectual disability, which we have recognized is a question of law. Moreover, Hill presented a § 2254(d)(1) argument in his opening brief. Hill's strategic decision to focus on § 2254(d)(2) in his en banc brief does not waive the prior arguments raised in his opening brief. And the Warden does not argue that Hill has waived his § 2254(d)(1) argument. Warden Supp. En Banc Br. at 12. Accordingly, I will analyze Hill's adaptive-deficits argument under both § 2254(d)(1) and (2), keeping in mind that Hill's arguments draw heavily on the facts.

Under § 2254(d)(1), we must decide whether the state courts' conclusion that Hill did not exhibit significant adaptive limitations was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Section 2254(d)(1) applies when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000). Under § 2254(d)(2), our review is limited to the question of whether the state court's findings amount to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In making that assessment, we are mindful that AEDPA directs us to presume that facts decided by the state court are correct absent "clear and convincing evidence" to the contrary. § 2254(e)(1).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. 415, 419–20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). We recognize, of course, that state court determinations are entitled to a great deal of deference. But "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## III.  DISCUSSION

**A.  *Atkins* Claim**

The Supreme Court held in *Atkins* that the Eighth Amendment prohibits the execution of intellectually disabled individuals.  536 U.S. at 314–17.  Although it ultimately left the development of the test for intellectual disability up to the states, *id.* at 317, the Supreme Court noted that two diagnostic manuals of the psychiatric profession require three separate findings before a diagnosis of intellectual disability is appropriate.[5]  *Id.* at 308 n.3.  Those findings are: (1) "significantly subaverage intellectual functioning";—typically indicated by an IQ level at or below 70; (2) "significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety"; and (3) manifestation or onset before the age of 18.  *Id.*

Ohio adopted the three-prong standard set forth in *Atkins* for evaluating a claim of intellectual disability in *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002).[6]  The Supreme Court of Ohio specifically approved the definition of intellectual disability set forth in the then current editions of the diagnostic manuals.  *Id.* at 1014.  Applying the standards in those manuals, individuals had significant limitations in adaptive skills if they exhibited deficits in at least two of the skill areas set out in *Atkins*.  *Id.*

Hill disputes the Ohio courts' finding that he did not exhibit significant adaptive limitations, and he emphasizes that he has been diagnosed as intellectually disabled and lacking in adaptive skills from a young age.  I agree:  Hill has exhibited significant adaptive limitations since childhood and cannot justifiably be executed even under the general *Atkins* standard.  *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("[E]ven a general standard may be applied in an unreasonable manner."); *see e.g.*, *Williams*, 529 U.S. at 367 (finding that a state-court

---

[5]Prior to 2007, the American Association on Intellectual and Developmental Disabilities (AAIDD) was known as the American Association on Mental Retardation (AAMR).

[6]Ohio later overruled *Lott* and substantially amended its standard for evaluating intellectual disability in *State v. Ford*, 140 N.E.3d 616 (Ohio 2019).

decision was both contrary to and an unreasonable application of the generalized standard for evaluating whether a petitioner's right to effective assistance of counsel was violated).

A state court decision is not entitled to AEDPA deference when "the factfinding procedures upon which the [state] court relied were 'not adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.'" *Panetti*, 551 U.S. at 954 (quoting *Ford v. Wainwright*, 477 U.S. 399, 423–24 (1986) (Powell, J., concurring in part and concurring in the judgment)). Here, the state trial court ruled that the focus of the evaluation would be Hill's present functioning, and therefore that contemporary evidence was what was primarily relevant—not historical accounts. The Ohio courts failed seriously to contend with the extensive past evidence of Hill's intellectual disability. *Atkins* cannot reasonably be interpreted to permit state courts to exclude or discount past evidence of intellectual disability. And the Ohio courts' cafeteria-style selection of some evidence from Hill's behavior during the proceedings in this case and while incarcerated, over evidence from his special education classes, resulted in an unreasonable determination of the facts.

The Supreme Court stated in *Atkins* that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also *significant limitations in adaptive skills* such as communication, self-care, and self-direction *that became manifest before age 18*." 536 U.S. at 318 (emphasis added). Accordingly, in *Williams v. Mitchell*, we held that the "refusal to consider past evidence of intellectual disability in determining whether [the petitioner] has significantly subaverage mental functioning and adaptive skills limitations" contravenes "clearly established Supreme Court precedent." 792 F.3d 606, 617, 619 (6th Cir. 2015). "[T]he clinical definitions cited with approval by *Atkins* and adopted by *Lott* do not treat present functioning and early onset as unrelated parts of a disconnected three-part test." *Id.* at 619. Intellectual disability must manifest before age eighteen. *Id.* Based on a "plain reading" of *Atkins*, "past evidence of intellectual disability—including evidence of intellectual disability from an individual's childhood—is relevant to an analysis of an individual's present intellectual functioning." *Id.*; *see also id.* at 626 (Gibbons, J., concurring in part and concurring in the judgment) (noting that *Atkins* "plainly require[s]" the consideration of past evidence of

intellectual disability, including evidence of a defendant's functioning pre-incarceration, "[g]iven the enduring nature of intellectual disability").

We also noted in *Williams* that, prior to *Atkins*, the Supreme Court had recognized that past evidence of intellectual disability is relevant to present or future functioning. *See id.* at 620 (majority opinion) (citing *Heller v. Doe*, 509 U.S. 312, 321–23 (1993)). In *Heller*, the Supreme Court held that civilly committing people with intellectual disabilities based on clear and convincing evidence of future dangerousness was constitutional because intellectual disability manifests during childhood and "is a permanent, relatively static condition, so a determination of dangerousness may be made with some accuracy based on previous behavior." 509 U.S. at 321–23 (citation omitted). "Thus, 'almost by definition in the case of the retarded [adult] there is an 18-year record upon which to rely' when assessing the individual's *future intellectual functioning*." *Williams*, 792 F.3d at 620 (alteration in original) (quoting *Heller*, 509 U.S. at 323). Although *Atkins* left to the states the job of delineating the precise contours of how to evaluate intellectual disability, clearly established law mandates that courts cannot, under any reasonable interpretation of *Atkins*'s general standard, discount or ignore evidence of intellectual disability from an individual's childhood.

In Hill's case, the Ohio Court of Appeals correctly set forth the three-prong *Atkins* standard as adopted by the Ohio Supreme Court in *Lott*. It also correctly noted that the second criterion under *Lott* requires the defendant to demonstrate "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction." *Hill*, 894 N.E.2d at 113 (quoting *Lott*, 779 N.E.2d at 1014). Then it veered off track. Focusing mostly on Hill's interactions with law enforcement, prison officials, and the courts, the Ohio courts discounted extensive past evidence of intellectual disability—including multiple diagnoses of intellectual disability and numerous comments on Hill's adaptive deficiencies made while Hill was in school. The two experts who concluded that Hill did not exhibit significant adaptive deficits did the same. In the few instances where the Ohio courts did confront Hill's school records, they grossly misrepresented the contents. The Ohio courts' decision to focus on and privilege contemporary evidence over historical accounts is contrary to clearly established Supreme Court precedent in *Atkins* and *Heller* and seriously undermined the courts' ability to make an accurate

assessment of Hill's intellectual disability. These errors amount to an unreasonable application of *Atkins* and an unreasonable finding of fact. *See Williams*, 792 F.3d at 626 (Gibbons, J., concurring in part and concurring in the judgment) ("By excluding the pre–1989 evidence, the state court severely limited its own ability to make a reasoned assessment of Williams's condition according to the legal and medical standard that *Atkins . . .* plainly require[s]."); *see also Panetti*, 551 U.S. at 953 (recognizing that "a general standard may be applied in an unreasonable manner," especially when a reviewing court faces "a record that cannot, under any reasonable interpretation of the controlling legal standard, support a certain legal ruling"). The majority, in concluding otherwise, refuses to acknowledge the significance, and in some cases the very existence, of these failures, misrepresentations, and omissions.

### 1. Significant Limitations

The history of Hill's diagnoses and adaptive limitations was given short shrift in the Ohio courts. According to the Ohio courts, the anecdotal evidence in the record "constituted a 'thin reed' on which to make conclusions about Hill's diagnosis." *Hill*, 894 N.E.2d at 124. Yet, as the district court noted, "the state-court record was hardly a 'thin reed.' At well over 6,000 pages, it was voluminous." *Hill v. Anderson*, No. 4:96-cv-00795, 2014 WL 2890416, at *24 (N.D. Ohio June 25, 2014). "[T]he true 'thin reed' in this case was the information that was available concerning Hill's adaptive functioning at the time he filed his *Atkins* claim," which, for whatever reason, was "the focus of the evaluation." *Id*.

Of the criteria for adaptive deficits set out in *Lott*, it is clear from the record that Hill displayed significant limitations, at the very least, in functional academics, hygiene/self-care, social skills, and self-direction. With respect to functional academics, Hill was considered "mentally retarded" by the Warren City Schools. He was diagnosed as "mildly retarded," "trainable mentally retarded," or "educable mentally retarded" several times before he turned 18, beginning with the recognition that he was a "slower learning child" when he began formal schooling at age 6. *See* R. 97 [disc 1] (Suppl. App.) (Pages 489–91). He scored 70 or below on every IQ test administered during his school years. *Id*. at 489–94, 511–19. He attended special

education classes for the entirety of his school career. R. 29 (Suppression Hr'g Tr.) (Page ID #3081–88).**7**

At age six, Hill did not know his age, but thought he was nine. R. 97 [disc 1] (Suppl. App.) (Page 489). His visual-motor coordination was at the three-year-old level, his reading and verbal skills were at the five-year-old level, and he had a mental age of four years and six months. *Id.* at 490. At age 8 years and 8 months, Hill was considered functioning at a "mid-kindergarten to beginning first grade level." *Id.* at 493. At age thirteen, he was functioning at the "mid-2nd grade level" in reading and the "mid-1st grade level" in arithmetic. *Id.* at 515. His psychologist noted that his learning abilities "ha[d] fallen 22 points" in the last five years, and that his relative weaknesses lie "in not being able to recall everyday information, do abstract thinking, perform mental arithmetic, perceive a total social situation, [and] perceive patterns." *Id.* At the same age, he was sent to a school for intellectually disabled children to continue his special education. *See id.* at 513–19. A school psychologist set out instructional goals that included teaching Hill his address and phone number, as well as how to tell time. *Id.* at 578. He exhibited weaknesses in reasoning ability, originality, verbal interaction, and a lack of intellectual independence.

By age fourteen, Hill was reading at a first-grade level and his math skills were at a third-grade level. He still had not mastered writing his own signature. *Id.* His teacher was working on self-control skills that should generally be mastered by a kindergarten student, including "working without being disruptive" and not touching other students inappropriately. *Id*. Teachers set academic objectives like learning to: tell time in five-minute intervals; write his own signature; shower regularly; put soiled clothing in the appropriate place; and eat and drink in a manner appropriate in a school setting.

Hill was transferred to another, similar school at fifteen because of poor academic achievement and behavior. R. 31 (Mitigation Hr'g Tr. at 77–79) (Page ID #3389–91). He received tutoring at a first-grade level for reading and a second-grade level for math. R. 97

---

**7**Hill was "mainstreamed" only in physical education and music, and struggled even there to keep up with and socialize normally with his peer group. R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 247–49). There is no record of him taking "mainstream" classes in any academic subject area, i.e., math, reading, or history. *See id.*

[disc 1] (Suppl. App.) (Page 525). At seventeen years old, after being arrested for, and pleading guilty to, two felony rape charges, the juvenile court placed Hill in a facility that housed youth offenders with mental disabilities or emotional problems. R. 31 (Mitigation Hr'g Tr. at 120–23) (Page ID #3432–35). There, Hill completed ninth grade in special education classes at age 18. R. 97 [disc 1] (Suppl. App.) (Page 533). After being released, he returned to high school, and testing indicated Hill was at a second-grade level for reading and math. *Id.* at 1109. Fife's murder occurred six months later.

The record also demonstrates that Hill was deficient in hygiene and self-care. At the age of fourteen, he still needed to be told to shower regularly, brush his teeth, and apply deodorant every day. He would not independently follow through and take care of his hygiene unless he was told to do so. At approximately age sixteen, a group home officer noted that although Hill was "improving in his personal hygiene," he still "need[ed] constant reminder[s] to shower, brush his teeth, etc." *Id.* at 524. Hill continued to have problems with his hygiene in prison and had to be reminded frequently to groom himself.

The record also demonstrates that Hill had limitations in the area of social skills. For example, the district court pointed to the testimony of psychologists who spoke to Hill's "poor self-esteem, inability to interpret social situations and create positive relationships, and [the fact] that he was easily influenced by people, gravitated toward an antisocial peer group, and did not respond appropriately to authority figures." *Hill*, 2014 WL 2890416, at *38. Hill's school and court records demonstrate that he had trouble making friends. At seventeen, Hill was described as "socially constricted" and possessing "very few interpersonal coping skills." R. 97 [disc 1] (Suppl. App.) (Page 530).

Hill also showed limitations in at least one more area—self-direction. Hill was described as "easily led" in both his school and court records, during periods both before and after he committed serious crimes while apparently acting alone. In school, Hill was described as immature and "easily led by others into trouble around school," like fighting. *Id.* at 515. He was vulnerable to exploitation by older individuals, displayed inappropriate and immature behaviors in class, rarely considered the consequences before acting, and had trouble conforming his behavior to the rules or the law. When Hill was thirteen, he was described as exhibiting a "great

deal of impulsivity." *Id.* When Hill was seventeen, he was evaluated by a psychologist who concluded that he had poor judgment, "d[id] not think of consequences," was "highly suggestable," and "was 'likely to be exploited'" if placed in a halfway home for adults "[b]ecause of his passivity and limited intellectual ability." *Id.* at 527–28. Another report from that same time expressed concern about his tendency to follow others. Even when he was in prison at age twenty-one, a correctional officer reported that Hill was easily led by other inmates and had to be told how to do his job at every step of the way. *See* R. 97 [disc 1] (*Atkins* Hr'g Tr.) (Pages 437–39).

Time after time, psychologists examined Hill and diagnosed him as intellectually disabled. R. 97 [disc 1] (Suppl. App.) (Pages 61–76, 513–30, 592–621). These psychologists assessed Hill's IQ and his adaptive skills. During one of the earliest assessments, his school's psychologist noted that Hill was limited in functional academics and self-direction. *Id.* at 63–65 (noting that Hill is "limited in his ability to generalize, to transfer learning from one situation to another, . . . or to do much self-evaluation"). Later assessments consistently detailed the same issues and deficits in social skills, communication, and self-care as well. *See, e.g.*, *id.* at 69, 71, 516, 519, 527–28, 530, 592.

In addition to his significant limitations in functional academics, self-care, social skills, and self-direction, the record also demonstrates that Hill never has lived independently, never had a driver's license or a bank account, never has been able to perform a job without substantial guidance from supervisors, was labeled "functionally illiterate" at school and in prison, could never read or write above a third-grade level, and could never adequately sign his own name.

Even if Hill appeared to be functioning at an average skill level to a layperson's eyes, it is common for someone with mild intellectual disability to present as functioning. *See* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 189). That is why the impressions of schoolteachers are critical—because children often are not diagnosed "until they get to school and teachers who are familiar with kids at various cognitive abilities discover that this child is, No. 1, not where they should be for their age in terms of their current [intellectual] functioning . . . . And, two, that as they try to teach them they learn at a much slower rate." *Id.* Comments from Hill's schoolteachers were largely left unaddressed—or were distorted—in the Ohio courts' analysis.

### 2. Unreliable Experts

Nevertheless, it might seem that the Ohio courts rendered a reasonable decision because they relied on the opinions of two psychological experts who found that Hill did not exhibit significant adaptive deficits. The majority here certainly takes that stance. Maj. Op. at 21–22. According to the Ohio Court of Appeals, the experts *and* the record provided "competent and credible evidence to support the trial court's conclusion that Hill does not meet the second criterion for mental retardation." *Hill*, 894 N.E.2d at 126. But both experts, at the trial court's direction, ignored evidence of adaptive deficiencies from Hill's school years, or set it aside as irrelevant to the task at hand. Anecdotal evidence, such as comments and records from schoolteachers and others who have interacted with or evaluated the subject, is key to the adaptive-deficits analysis. *See Hill*, 894 N.E.2d at 124–25 (discussing anecdotal evidence); R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 383–84) (stating that the psychological profession values "collateral information"); R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 696) (stating the importance of "drawing information from many different sources of functioning in every day life under every day circumstances").

Two experts testified in Hill's *Atkins* proceedings that Hill did not display significant adaptive limitations. *State v. Hill*, No. 85-CR-317, at 79–80 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Pages 3477–78)]. The state trial court relied upon their opinions to conclude that Hill had failed to demonstrate significant adaptive deficits. *Id*. at 81 (Page 3479).[8] All three experts, including Dr. Hammer (Hill's expert), found that Hill malingered or tried to "fake bad" on the adaptive skills tests given to him in 2004. *Id.* at

---

[8]We have previously denied *Atkins* relief in an AEDPA case arising out of Ohio where, as here, two of the three mental-health experts testified that the petitioner was not intellectually disabled. *O'Neal v. Bagley*, 743 F.3d 1010, 1023 (6th Cir. 2013) ("With expert testimony split, as it often is, the state court chose to credit Dr. Chiappone and Dr. Nelson over Dr. Tureen, and we cannot say from this vantage that it was unreasonable to do so."). However, *O'Neal* is distinguishable on its facts, and Hill's claim for *Atkins* relief is much stronger than the petitioner's claim in *O'Neal*. For example, in *O'Neal* there was insufficient evidence to prove that the petitioner met the first prong in demonstrating "significantly subaverage intellectual functioning." *Id*. at 1022. Here, by contrast, Hill's IQ is so low that the Warden concedes that Hill satisfies the first prong. Additionally, O'Neal's claim for *Atkins* relief also failed because his adaptive deficits may well have been better explained by his drug abuse and personality disorder rather than organic mental illness. *Id*. at 1022–23. Furthermore, we have never held that a reliance on an expert witness's conclusion makes a state court's determination reasonable per se. Instead, we consider whether "the record read as a whole" allows a reviewing court to conclude that the state court's determination was unreasonable. *Id.* at 1022; *see also Carter v. Bogan*, 900 F.3d 754, 768, 771 (6th Cir. 2018).

53, 81 (Pages 3451, 3479). In coming to their decision that Hill was not, at present, intellectually disabled, Drs. Olley (the state's expert) and Huntsman (the trial court's expert) heavily weighed the fact that Hill malingered. *See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 781); R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1050–51). *But see* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 211) (stating that a person with intellectual disability can still lie, manipulate, and cheat). Drs. Olley and Huntsman also emphasized the sophistication of Hill's crimes and his interactions with prison, law-enforcement, and court officials. *See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Pages 726–31, 737–50, 770–75); R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1027, 1034–35, 1040–44). Dr. Hammer, on the other hand, based his diagnosis on all types of anecdotal evidence, including Hill's records from school, and concluded that Hill satisfied all three prongs for a diagnosis of intellectual disability. *See* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 383–84); *id.* at 156 ("My opinion is that [Hill] falls within the high end of the mild retardation range."); *see also id.* at 190 (describing mild intellectual disability as "significant" or "severe" impairment in the ability to function).

Dr. Olley (the state's expert) stated that Hill's memory was very good in court on April 15, 2004, when he provided details of events. R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 744). Dr. Olley also stated, based on an interview with Hill, that Hill was able "to express a complex explanation of the crime in order to support his claim of innocence." R. 97 [disc 1] (Suppl. App.) (Page 1125). Although Dr. Olley admitted that Hill's case was a "close call," R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 861), he nevertheless concluded that Hill's "way of presenting himself," both in his police interrogation and before the court, was inconsistent with an intellectual-disability diagnosis, *id.* at 718–19, 726–27. Dr. Olley said that he had never heard of an intellectually disabled inmate calling the media to arrange an interview, as Hill did in this case by reaching out to the *Tribune Chronicle*. *Id.* at 763. Dr. Olley noted that Hill was able to tell an elaborate "conspiracy" theory about the events leading to his capital trial for Fife's murder, which echoed a "very similar" soliloquy he made before the trial court on April 15, 2004. *Id.* at 770–72. Dr. Olley characterized this soliloquy as "long," "rambling," and ultimately implausible—but he testified that he was nonetheless "struck" by Hill's "sophisticated memory and reasoning." *Id.* at 744, 771–72.

Dr. Huntsman (the trial court's expert) similarly focused in her report on Hill's "remarkable memory for the history of his case," his detailed and "very complex explanation for how Raymond Fife came to be killed," as well as the "competencies" observed by staff members in prison. R. 97 [disc 1] (Suppl. App.) (Page 1141). Dr. Huntsman described Hill's story as "bouncing around in time," and she initially "couldn't keep track of what [they] were talking about." R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1021). She characterized the conspiracy story as "remarkable and not likely, not very plausible." *Id.* at 1025. Still, despite the story's apparent lack of "logic," Dr. Huntsman noted "the degree of organization, the degree of complexity[,] and the degree of memory that he displayed as [they] talked." *Id.* at 1025–26, 1031. She testified that it was not the story Hill told, but his "process of telling the story"—which demonstrated complexity, "sophistication," a noteworthy vocabulary, and a "general ability to communicate"—that led to her conclusion that he was not intellectually disabled. *Id.* at 1190.

In the end, Drs. Olley and Huntsman each opined that Hill was "borderline intellectual functioning" as defined in the DSM-IV. *See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 936); R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Page 1044); *id.* at 1049 (stating that "what makes me say that I believe that in my opinion he falls within the borderline range of intellectual functioning has to do with his adaptive behavior"). Dr. Olley described borderline intellectual functioning as "no mental retardation but it is the . . . functioning that is . . . between one standard deviation below the mean and two standard deviations below the mean," *i.e.*, an IQ range between "71 to 85." R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 936). Drs. Olley and Huntsman came to this conclusion even though people at the lower end of borderline intellectual functioning and the higher end of intellectual disability are "going to be quite similar . . . in some regards," R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 465), including in their ability to create a "script" involving various people and events, *id.* at 537–38.

In the opinion of Dr. Hammer (Hill's expert), Hill's behavior was not inconsistent with that of a person with mild intellectual disability because those persons often attempt to don a "cloak of competence." *Id.* at 191–92. "[M]any people with mild [intellectual disability]," he explained, "are quite aware of their deficits in learning and functioning and are somewhat

worried that other people will find that also. So they oftentimes will develop certain skill areas that they can hold out as indicating that they have a competence in a certain area and, therefore, are trying to mask . . . what their deficits actually are." *Id.* This frequently involves "learning sort of . . . scripts or scenarios that they can kind of pull out." *Id.* at 192–93. The trial court, which adopted the opinions of Drs. Olley and Huntsman, but made no reference to Dr. Hammer's cloak of competence discussion in its opinion, apparently did not afford this concept much weight.

Drs. Olley and Huntsman also placed significant weight on the testimony of prison officials about Hill's recent behavior in the prison environment. These officials considered Hill "average" in intelligence compared to other death row inmates. "They testified that Hill interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules." *Hill*, 2014 WL 2890416, at *39 (quoting *Hill*, 894 N.E.2d at 124). One official said that Hill was feigning intellectual disability for his *Atkins* claim, and another said that Hill's hygiene was "poor but not terrible." *Id.* (quoting *Hill*, 894 N.E.2d at 125).

As the district court noted, all of the experts conceded that relying on Hill's behavior in prison to assess adaptive skills is problematic because "death row is a segregated, highly structured and regulated environment." *Id.* at *42.[9] Evidence of adaptive functioning in this kind of controlled setting is of limited value because inmates do not have the same opportunities to acquire new skills or show weaknesses in existing skills. Assessing Hill's adaptive deficits as an adult is particularly challenging given the absence of any reliable testing to measure Hill's adaptive functioning and the lack of reliable evidence of how Hill would have functioned as an adult in general society as he has been incarcerated for all but six months of his adult life. Given the lack of evidence regarding Hill's likely adaptive performance as an adult in the general community, the experts should have utilized all available evidence.

---

[9]The medical literature available in 2008 prohibited the assessment of adaptive skills in atypical environments like prison. For example, the 2002 AAMR Manual says "[l]imitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture." AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 13 (10th ed. 2002). It explains: "[t]his means that the standards against which the individual's functioning must be measured are typical community-based environments, not environments that are isolated or segregated by ability." *Id.* at 8.

The majority acknowledges that Dr. Huntsman, in particular, considered prison officials' descriptions of Hill's adaptive behavior as "'[the] most persuasive[]' evidence" of Hill's adaptive functioning. Maj. Op. at 22 (alterations in original) (quoting R. 97 [disc 1] (Suppl. App.) (Page 1141)). Given that the existing medical guidelines prohibited measuring an individual's functioning based on their behaviors in a prison setting, Dr. Huntsman's weighty reliance on this evidence in coming to her conclusion about Hill's intellectual disability casts serious doubt on its reasonableness. The same is true for Dr. Olley, especially in light of his own admission that "[i]t is impossible to assess all of Mr. Hill's adaptive behavior while he is in prison." R. 97 [disc 1] (Suppl. App.) (Page 1124).

Drs. Olley and Huntsman leaned heavily on these prison officials' testimony rather than treating them with the degree of skepticism mandated by the medical literature. As the district court noted, the weight of the testimony from various death-row prison officials was limited by their potential bias against the inmates they were charged with guarding, as well as the shortcomings affecting lay opinions about intellectual disability generally. *Hill*, 2014 WL 2890416, at \*42–43. And many of the specific prison officials' statements were "rife with contradictions, with themselves and each other." *Id*. at \*43.

These flaws might be forgivable under AEDPA deference, but there is one problem with Drs. Olley's and Huntsman's testimony that we cannot overlook: neither of them grappled with the extensive past evidence of Hill's intellectual disability. Both experts, instead, assessed Hill's adaptive skills "as they existed at the time of the hearing"—even though intellectual disability is a static condition. *Id.* at \*23; *see Heller*, 509 U.S. at 323; *Williams*, 792 F.3d at 617–19; R. 97 [disc 1] (Suppl. App.) (Page 1125) (Dr. Olley reporting that "[t]he available information on Mr. Hill's *current functioning* does not allow a diagnosis of mental retardation") (emphasis added). At the State's urging, the trial court ruled that it would focus the *Atkins* inquiry on Hill's current functioning, but noted that it would not preclude historical evidence from coming in. R. 97 [disc 1] (Suppl. App.) (Pages 175–81, 217–23, 247–50). As a result, the opinions of Drs. Olley and Huntsman, like the Ohio courts' own assessments, lack a credible foundation.

Dr. Olley recognized the importance of anecdotal evidence when he relied on testimony from prison guards to assess Hill's adaptive skills. But when it came to past anecdotal evidence

of Hill's adaptive deficits, Dr. Olley dismissed it as evidence of low *academic* skills only. R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 783). Acknowledging that Hill's schoolteachers thought he was intellectually disabled, Dr. Olley said that he could not say the same because "[t]he information is simply not available." *Id.* As detailed extensively above, that is simply not true.

The majority finds Dr. Olley's determination to be reliable because Dr. Olley "did not dismiss Hill's past anecdotal evidence; rather, he concluded after reviewing the record that 'there was inadequate information about adaptive behavior that would allow [him] to conclude that there was a significant impairment in adaptive behavior' at the time of the offense." Maj. Op. at 20 (alteration in original) (quoting R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 780)). But that conclusion ignores Dr. Olley's failure to engage with or consider the numerous reports from teachers, mental health professionals, and other relevant observers of Hill's adaptive behavior, directly contravening Dr. Olley's admitted methodology for determining intellectual disability and what constitutes adequate information. *See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Pages 696–97) (noting that for retrospective determinations of intellectual disability, experts should rely on records and statements from "teachers," "mental health professionals," and "other people who know the individual well").[10] Those records are replete with observations and diagnoses of significant limitations in adaptive behavior that Dr. Olley never mentioned or explained away as irrelevant or inadequate in the areas of self-care or self-direction. For example, in the area of self-direction, Dr. Olley failed to contextualize the results of the standardized tests administered by mental health professionals with the numerous accounts throughout Hill's childhood and teenage years from teachers, psychologists, and social workers who testified that Hill was easily led and a follower. *Hill*, 2014 WL 2890416, at *30–33. More importantly, Dr. Olley admitted that Dr. Nancy Schmidtgoessling, one of the psychologists who testified during the mitigation phase of Hill's trial, assessed Hill's adaptive behavior when she diagnosed him as intellectually disabled. *See* R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Pages 941–42). But Dr. Olley never explained why he found that diagnosis unreliable.

---

[10]Dr. Olley explained to the trial court that "our protocol was different" from other cases for which he had served as an expert "in the sense that in speaking among the three psychologists, we were aware of your order to look at Mr. Hill's present functioning." R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 862). He further explained that it was because of the trial court's order that the experts focused on Hill's adaptation to prison life. *Id.*

As for Dr. Huntsman, she, too, did not give much thought to the past anecdotal evidence of Hill's adaptive deficits. She stated that she was retained to decide "whether [Hill] is *now* a mentally retarded individual." R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Page 1052) (emphasis added). When prompted for her opinion of Hill's school records, she stated that these records were not as reliable as the court-conducted tests because teachers' assessments "were being done for a very different purpose." *Id.* at 1046. Never mind that the Ohio Supreme Court had already decided in *White* that school records *are* relevant for an adaptive-deficits analysis. *State v. White*, 885 N.E.2d 905, 916 (Ohio 2008); *see also Heller*, 509 U.S. at 323 (noting that for intellectual disability determinations "there is an 18-year record [of past behavior] upon which to rely"). Never mind that several of the assessments used to evaluate Hill relied on definitions of intellectual disability that match *Lott*'s factors. *See e.g.*, R. 97 [disc 1] (Suppl. App.) (Page 592–93) (finding that Hill qualified for placement into a special education program for intellectually disabled students because he exhibited "significant subaverage intellectual functioning" and deficiencies in at least two areas of adaptive behavior as determined by a multidisciplinary team that included a qualified psychologist). Dr. Huntsman also speculated that Hill had not tried his hardest in school. R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Page 1048).[11] In fact, at one point Dr. Huntsman dismissed the evidence of Hill's adaptive deficits during his teenage years as Hill being "a pretty troubled and pretty troublesome youth" due to his school system record. *Id.* at 1047. Despite Dr. Huntsman's detailed analysis of the reports from prison guards, there is no comparable analysis of the overwhelming historical records detailing Hill's struggles with self-care, self-direction, and academic functioning. Dr. Huntsman testified that, excluding Hill's mother, the record did not contain any non-school records providing evidence of Hill's adaptive skills or deficits. *Id.* at 1090, 1098.[12] This completely ignores the highly relevant non-school records and testimony from Brinkhaven, where social workers observed Hill at all times and noted significant limitations in self-care, academic functioning, and self-direction. *See Hill*, 2014 WL 2890416, at *31. Having disregarded much of the past anecdotal evidence, Dr. Huntsman stated that Hill

---

[11]Dr. Huntsman did not point to, nor have we been able to discover, any evidence in Hill's school records demonstrating that he intentionally performed poorly in school.

[12]The record also indicates that, if anything, Hill's mother "overestimated [Hill's] adaptive behavior." R. 97 (Suppl. App.) (Page 527).

"probably" was not intellectually disabled at the time of the offense. R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Page 1052) ("I think that the only thing that I've said today that I didn't say previously in my report, because I wasn't asked to address it in my report, is that my opinion is that he was probably not retarded at the time of the offense.").

Even though Drs. Olley and Huntsman conceded that this was a close case, they made no real attempt to reconcile their outcome with Hill's past diagnoses of intellectual disability and the voluminous relevant evidence of Hill's significant adaptive limitations—and in fact, they were effectively told not to do so. As we held in *Williams*, *Atkins* and *Lott* recognized that intellectual disability presents itself in childhood and is a permanent condition. *See Williams*, 792 F.3d at 619–20. Under *Atkins*, courts cannot limit their focus to contemporary accounts while discounting past evidence of intellectual disability. The Ohio trial court's erroneous instruction substantially undermined the Ohio courts' ability to rely reasonably on Dr. Olley's and Dr. Huntsman's conclusions regarding Hill's intellectual disability.

Having set their gaze on Hill's interactions with prison, court, and police officials, Drs. Olley and Huntsman said next to nothing about the substantial evidence in the record from Hill's time both in school and in prison that Hill was easily led, struggled to communicate, struggled with his personal hygiene, and struggled to read. These failures only encouraged the Ohio courts to do the same. Rather than grapple with the extensive record of Hill's intellectual disability, the state trial court made its findings based on Hill's scattered and scripted conspiracy story of the Fife murder, his demeanor in interacting with law enforcement and the legal system, and the supposed sophistication of his crimes. *State v. Hill*, No. 85-CR-317, at 73–77 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Pages 3471–76)]. Those "adaptive strengths" convinced the state trial court that Hill could not be intellectually disabled because he had "remarkable" communication and vocabulary skills and was self-directed. *Id.* at 74 (Page 3472). As shown throughout this discussion, there is substantial evidence in the record to contradict these findings, which are based on evidence—Hill's functioning in a prison setting—prohibited by existing medical guidelines. *See, e.g.*, discussion *infra* Section III.A.3. Unlike the Ohio courts and Drs. Olley and Huntsman, I cannot cast aside years of highly probative evidence and repeated diagnoses of intellectual disability. To do so

flies in the face of then-prevailing medical standards, relevant guidance from the Ohio Supreme Court, and the doctors' own methodologies. Viewed in the context of the entire record and based on clearly established Supreme Court precedent, no fairminded jurist could find their factual determinations to be reasonable.

**3. Myths and Misrepresentations**

To the extent that the Ohio courts addressed past evidence of Hill's adaptive deficits, they misconstrued it or tried to offset it with irrelevant facts. Rather than take this evidence seriously, the Ohio Court of Appeals adopted the trial court's analysis as consistent with its own perception of the record:

> *Public School Records*. Hill's public school records amply demonstrate a history of academic underachievement and behavioral problems. Hill is often described as a lazy, manipulative, and sometimes violent youth. Although there are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone. Hill knew how to write and was described by at least one of his special education teachers as "a bright, perceptive boy with high reasoning ability."

> *Hill's Trial for the Murder of Raymond Fife*. The trial court observed that the record of Hill's murder trial provided evidence of Hill's ability concerning self-direction and self-preservation. In particular, the court noted Hill's initiative in coming to the police in order to misdirect the focus of the investigation by implicating others and Hill's ability to adapt his alibi to changing circumstances in the course of police interrogation. This last point was also noted by Dr. Olley in his hearing testimony: Hill "stood his ground during that interrogation very, very strongly. * * * He not only modified his story a little bit when he was faced with evidence that couldn't possibly have avoided. * * * That to me is a kind of thinking and planning and integrating complex information that is a higher level than I have seen people with mental retardation able to do."

> *Death Row Records*. At the time of the evidentiary hearing, Hill had been incarcerated on death row for 20 years. From this period of time, the trial court considered audiotaped interviews of Hill by Warren's Tribune Chronicle reporter Andrew Gray in the year 2000. These interviews were arranged on Hill's initiative in order to generate publicity for his case. The trial court found Hill's performance on these tapes demonstrated a high level of functional ability with respect to Hill's use of language and vocabulary, understanding of legal processes, ability to read and write, and ability to reason independently.

The trial court considered the evidence of the various prison officials who testified at the evidentiary hearing. These witnesses consistently testified that Hill was an "average" prisoner with respect to his abilities in comparison with other death row inmates. They testified that Hill interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules. Prison officials offered further testimony in their interviews with the expert psychologists. One official opined that Hill began to behave differently after *Atkins* was decided, and he believed that Hill was "playing a game" to make others think he is retarded. Another official reported that Hill's self-care was "poor but not terrible" and that Hill had to be reminded sometimes about his hygiene.

*Hill's Appearances in Court.* The trial court stated that it had "many opportunities" to observe Hill over an extended period of time and, as a lay observer, did not perceive anything about Hill's conduct or demeanor suggesting that he suffers from mental retardation.

*Hill*, 894 N.E.2d at 124–25.

These findings are deeply troubling. To start, the Ohio courts' finding "that Hill 'underachieved' academically or in any other adaptive skill as a child is," as the district court remarked, "squarely contradicted by the record." *Hill*, 2014 WL 2890416, at \*26. The district court could not find, and neither could I, "one reference in Hill's school records by a teacher, school administrator, psychologist, psychiatrist, or anyone else suggesting that Hill was capable of performing at a substantially higher level but chose not to." *Id.* (footnote omitted). And as the experts in this case testified, evidence of behavioral problems or a conduct disorder simply does not undermine a simultaneous finding of intellectual disability. *See* R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 612); R. 97 [disc 1] (Olley Test., *Atkins* Hr'g Tr.) (Page 713) ("[I]f he's having conduct problems in school, that's neither here nor there to a diagnosis of mental retardation."); (R. 97 [disc 1] (Huntsman Test., *Atkins* Hr'g Tr.) (Pages 1102–03). While conceding that "there are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone." *Hill*, 894 N.E.2d at 124.[13] The state courts incorrectly discounted the numerous reports that Hill was easily led because he committed

---

[13]The Ohio courts' use of the word "references" is also a serious mischaracterization of the record. As the district court found, almost every evaluation of Hill in his school records described Hill's tendency to be "easily influenced" by others. *Hill*, 2014 WL 2890416, at \*26 n.19. These consistent assessments amount to much more than fleeting "references."

crimes on his own. Under then-prevailing medical standards, Hill's prior criminal behavior is completely irrelevant to any determination of whether he exhibited deficits in adaptive skills. *See Hill*, 2014 WL 2890416, at *26.

The Ohio courts' focus on a note drafted by a teacher *in a school for intellectually disabled children* describing Hill as "'bright' and 'perceptive,' with 'high reasoning ability'" was, as the district court put it, "almost cynical in its selective misrepresentation of the facts." *Hill*, 2014 WL 2890416, at *27. In the same report, Hill's special education teacher noted that Hill, who was thirteen at the time, had the reading skills of a first-grader and the math skills of a third-grader. R. 97 [disc 1] (Suppl. App.) (Page 578). Her proposed goals for Hill were for him to shower regularly, eat and drink in a manner appropriate to school, blend letter sounds to say words altogether out loud, tell time in five-minute intervals, and count change up to $1.00. *Id.* The Ohio courts' statement that Hill knew how to write suffers from the same flaw. At best, it is an erroneous description of Hill's abilities; at worst, it purposefully distorts the record. *See Hill*, 2014 WL 2890416, at *27 (finding that there is "no evidence in the record that Hill could write much more than his name during his school years, and struggled even with that"). More importantly, the Ohio Court of Appeals blatantly omits the uncontradicted evidence from Hill's childhood through teenage years detailing Hill's consistent academic struggles. *See* discussion *supra* Section III.A.1.

The Ohio courts' handling of evidence regarding self-care is equally troubling. The Ohio Court of Appeals's sole reference to Hill's deficits with regard to self-care was its summary of testimony provided by a prison official "that Hill's self-care was 'poor but not terrible' and that Hill had to be reminded sometimes about his hygiene." *Hill*, 894 N.E.2d at 125. Such a statement downplays the record's extensive chronicling of Hill's struggles with hygiene, including the fact that an individual education plan established for Hill when he was nearly fourteen years old included an "[a]nnual [g]oal and [o]bjective" of helping Hill "learn to shower when necessary" and to "put soiled clothing in the appropriate place." R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Pages 280–81, 327). In short, the Ohio Court of Appeals's description of Hill's school records does not contain a single accurate characterization of the evidence that is relevant to determining whether Hill exhibits significant limitations in adaptive behavior.

Instead, we are left to assume that the appellate court and also the trial court were all but oblivious to the ample amount of evidence that credibly establishes Hill's limitations in functional academics, self-care, social skills, and self-direction.

The state trial court also unduly relied on Hill's "initiative in coming to the police" after Fife's death, as well as his alleged efforts to misdirect the investigation and fabricate an alibi while under interrogation, as "evidence of Hill's ability concerning self-direction and self-preservation." *Hill*, 894 N.E.2d at 124. But Hill was not even a suspect before he went to the police, and his statements are what aroused their suspicion. Incriminating oneself is hardly self-preservation. And as the district court noted, "'[s]elf-preservation' is not [even] among the adaptive skills measured under the clinical definitions of intellectual disability." *Hill*, 2014 WL 2890416, at *33. And "self-direction" covers a host of behaviors—including "initiating activities appropriate to the setting" and "demonstrating appropriate assertiveness and self-advocacy skills"—that are either unrelated or directly contrary to Hill's decision to make contact with the police. *Id.* (quoting AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 40 (9th ed. 1992)).

Moreover, contrary to the Ohio courts' findings, Hill's "performance" during the police interrogation revealed him to be "childlike, confused, often irrational, and primarily self-defeating," and Hill's attempts to change his story under pressure failed to "skillfully hid[e] his part" in Fife's death. *Id.* at *34. The police even stated that Hill was suggestible, telling him that "Everytime [*sic*] we suggest something to you, you have a tendency to agree with us." R. 26 (Trial Tr. at 30) (Page ID #2105). Hill often changed his story or "embellished his statement[s] at the slightest suggestion by the police, even when the information at issue was irrelevant or incriminating." *Hill*, 2014 WL 2890416, at *35. These actions "were quite the opposite of adaptive." *Id.* at *34. This is especially true where Hill's decision to approach the police did not "resolve his problems," but "succeeded only in immediately drawing the police's attention to himself." *Id*. I fail to see how such behavior reasonably could be interpreted as exhibiting *skills* in "making choices," "resolving problems," and "demonstrating appropriate assertiveness and self-advocacy skills." AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 40 (9th ed. 1992).

While purportedly relying on prison accounts, the Ohio courts made no mention of Hill's prison *records*. Those records reflect that prison officials always understood Hill to be mentally incapacitated or "slow." As when he was in school, Hill was considered to be illiterate in prison. He was understood to have a "very limited writing ability," and he had other inmates write for him. R. 97 [disc 1] (Hammer Test., *Atkins* Hr'g Tr.) (Page 439). Notes written from Hill to prison officials make clear that he had trouble keeping track of his prison account balance. According to fellow inmates, when Hill was given a task, he had to be carefully supervised because he could not remember how to complete the assigned task. At least one prison official reported that Hill was able to perform his job as a porter because the cleaning supplies were sorted by color, so Hill was not required to read the supplies' instructions. *Id.* at 363, 1381.

Rather than credit the ten intellectual-disability diagnoses that Hill received prior to *Atkins* even being decided, the trial court made its own lay judgment that "there is nothing about [Hill's] general appearance—facial expressions or conduct—suggesting . . . that the Petitioner is mentally retarded." *State v. Hill*, No. 85-CR-317, at 76 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported) [R. 97 [disc 1] (Suppl. App.) (Page 3474)]. The Ohio Court of Appeals defended that lay judgment on the basis that the experts also believed that Hill failed to exhibit significant adaptive deficiencies. *See Hill*, 894 N.E.2d at 125–26.

Perhaps most disturbing, three psychologists who testified at Hill's pre-*Atkins* mitigation hearing concluded that Hill was intellectually disabled and had extremely poor adaptive functioning. On appeal, the Ohio Supreme Court and Court of Appeals found these psychologists' testimony credible and concluded that Hill was intellectually disabled. *See State v. Hill,* 595 N.E.2d 884, 901 (Ohio 1992); *State v. Hill*, Nos. 3720, 2745, 1989 WL 142761, at *6, *32 (Ohio Ct. App. Nov. 27, 1989). It was only after *Atkins* came down, and Hill was again assessed for intellectual disability in renewed state-court proceedings, that the Ohio courts reversed course. *See Hill*, 300 F.3d at 682 (remanding this case to the Ohio courts so that Hill could exhaust his *Atkins* claim, while recognizing that the "Ohio courts reviewing his case have [already] concluded that Danny Hill is retarded and voluminous expert testimony supported this conclusion" (citation omitted)). Yet the Ohio Court of Appeals does not attempt to address this highly relevant evidence. *See* Maj. Op. at 15.

Unfortunately, the majority papers over, when it does not outright ignore, the Ohio Court of Appeals's egregious mischaracterizations and omissions of probative favorable evidence. Like the Ohio courts, the majority flagrantly downplays the overwhelming evidence in Hill's juvenile records that sets out Hill's limitations in adaptive functioning. For example, the majority describes Hill's school records as merely "suggest[ing] that [Hill] struggled academically as a child." Maj. Op. at 13. But unanimous observations from teachers, social workers, and psychologists that Hill consistently performed far below his age-level in almost every academic arena do not constitute a "suggestion" of a deficit. They are uncontradicted evidence of a significant limitation. The majority admits that the Ohio Court of Appeals's "short summary of [Hill's school records]" omits evidence concerning Hill's skills in academics, self-direction, and self-care. *Id.* at 12. But again, it attempts to erase the significance of this error by portraying the evidence as only possibly "relevant to determining whether Hill had significant limitations in two or more adaptive skills." *Id.* at 14. That characterization cannot stand in the face of clearly established law that instructs us to rely on "the documentation and other evidence of [intellectual disability]" that has accumulated during the individual's first eighteen years when assessing intellectual functioning. *Williams*, 792 F.3d at 620 & n.4 (quoting *Heller*, 509 U.S. at 322) ("[E]vidence of intellectual disability from earlier in life is directly relevant to present-day intellectual disability determinations.").

The majority refuses to recognize the substantial effect of these errors on our determination of whether the Ohio Court of Appeals's conclusion that Hill did not have significant limitations in two or more adaptive skills was more than just incorrect but was unreasonable. Several courts have recognized that errors of this magnitude can fatally undermine the factfinding process, rendering the resulting factual finding unreasonable. *See Taylor v. Maddox*, 366 F.3d 992, 999–1001 (9th Cir. 2004) (holding that a state court's clear misapprehension or misstatement of the record that "goes to a material factual issue that is central to petitioner's claim" and a state court's "failure to consider and weigh relevant evidence" that is "highly probative and central to the petitioner's claim" can render "the resulting factual finding unreasonable"), *abrogated on other grounds by Cullen v. Pinholster*, 563 U.S. 170 (2011); *Byrd v. Workman*, 645 F.3d 1159, 1171–72 (10th Cir. 2011) (following *Taylor*); *Gray v. Zook*, 806 F.3d 783, 791 (4th Cir. 2015) ("When a state court apparently ignores a

petitioner's properly presented evidence, its fact-finding process may lead to unreasonable determinations of fact under § 2254(d)(2)."); *see also Miller-El*, 537 U.S. at 346 (finding it concerning under § 2254(d)(2) that a "state court also had before it, and apparently ignored" probative evidence that was central to a petitioner's claim of a constitutional violation). The Ohio Court of Appeals did not just plainly misstate and grossly mischaracterize the record. Its misstatements and mischaracterizations are of highly probative evidence related to Hill's adaptive functioning, which is central to his *Atkins* claim. Furthermore, the Ohio Court of Appeals's treatment of the historical record and of Hill's functioning in prison contained inexcusable omissions of evidence that not only are inconsistent with its findings but also are "sufficient to support [Hill's *Atkins*] claim when considered in the context of the full record." *Taylor*, 366 F.3d at 1001, 1007–08. As detailed above, the Ohio courts' reliance on the conclusions of Drs. Olley and Huntsman cannot serve to mitigate or cure these errors.

\*\*\*

The evidence that Hill is intellectually disabled is overwhelming. It is clear from the record that Hill was universally considered to be intellectually disabled and seriously lacking in adaptive skills by schoolteachers, administrators, social workers, psychologists, the juvenile court system, and even (previously) the Ohio Supreme Court. Hill consistently performed very poorly in school (functional academics); there was consistent documentation that he had trouble maintaining proper hygiene despite reminders (self-care); he had trouble making friends and responding appropriately to authority figures (social and communication); and he was described as a follower, easily led, and vulnerable to exploitation by adults (self-direction). The record shows that these deficits largely continued into adulthood, particularly with respect to self-care and functional academics. Nevertheless, the state courts and the experts they retained failed to grapple with this extensive social history, choosing instead to favor the accounts of prison guards and personal observations.

The Ohio courts' legal conclusions breach the most basic tenets of *Atkins*, and their factual findings cannot be sustained on this record. *Atkins*, on its most basic level, forbids the execution of persons who are intellectually disabled. It requires courts to look at all relevant evidence of intellectual disability—and certainly evidence of manifestations before the age of 18.

This is not a case where evidence of intellectual disability comes out after conviction. Hill was diagnosed as intellectually disabled from a very young age. He attended special education classes. He could not be counted on to bathe. Yet, the Ohio courts were impressed by his ability to incriminate himself to the police and to rehash a scripted story in a cloak of competency. They valued the conflicting opinions of prison guards interacting with Hill in a highly structured setting over professional reports and diagnoses recorded over a lifetime. Even if *Atkins* alone poses no bar to offsetting adaptive deficiencies with adaptive strengths, the Ohio courts failed to grapple with the evidence in the record indicating that Hill's perceived strengths were actually weaknesses. As the Ohio Court of Appeals itself stated at the penalty phase, "The record is replete with competent, credible evidence which states that [Hill] has a diminished mental capacity. He is essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient motor skills." *Hill*, 1989 WL 142761, at *32. There is no getting around it—Hill is intellectually disabled. To deny the obvious is unreasonable. Thus, respectfully, I dissent.

**B. Ineffective Assistance of Counsel**

Because I believe that we should grant habeas relief on Hill's *Atkins* claim, I would pretermit Hill's claim of ineffective assistance by his *Atkins* counsel. However, because the majority reaches Hill's ineffective-assistance-of-counsel claim, I write to express my views on its analysis. The district court held that Hill's ineffective-assistance-of-counsel claim is barred by 28 U.S.C. § 2254(i), which prohibits a petitioner from seeking habeas relief because of the ineffectiveness of his counsel at a post-conviction proceeding. *Hill*, 2014 WL 2890416, at *52–53. At the heart of this issue is a deeply important constitutional question: whether petitioners bringing *Atkins* claims that arise after their initial appeals due to the retroactivity of *Atkins* have a Sixth Amendment right to the effective assistance of counsel. An answer in the affirmative would trump any statutory instruction that seemingly bars such a claim. The majority, in denying Hill's claim on the merits, decides not to resolve this issue. Maj. Op. at 23. However, I believe that the importance of the issue warrants addressing why we should conclude that Hill had the right to effective assistance of counsel during his *Atkins* hearing.

The Warden's argument and the district court's conclusion that § 2254(i) prevents Hill from bringing a habeas claim based on the ineffectiveness of his *Atkins* counsel rests on the

foundation that Hill's *Atkins* hearing qualifies as a post-conviction proceeding. Thus, under the Supreme Court's general rule, Hill had "no constitutional right to an attorney" and consequently "cannot claim constitutionally ineffective assistance of counsel in such [a] proceeding[]." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). However, in *Hooks v. Workman*, the Tenth Circuit, the only other circuit to review this issue, "concluded that defendants in *Atkins* proceedings have the right to effective counsel secured by the Sixth and Fourteenth Amendments" even when the *Atkins* proceeding takes place after a defendant's conviction due to the retroactivity of *Atkins*. 689 F.3d 1148, 1183–84 (10th Cir. 2012). Consequently, the Tenth Circuit held that, in such circumstances, a defendant's ineffective-assistance-of-counsel claim "[was] properly . . . subject to federal habeas review under 28 U.S.C. § 2254." *Id.* at 1174. I find the Tenth Circuit's reasoning to be persuasive. The Supreme Court's fundamental-fairness jurisprudence also mandates that we conclude that Hill's claim is cognizable under § 2254. When examined in the context of Supreme Court habeas and capital-punishment caselaw, *Atkins* should be read as establishing a special exception regarding the right to counsel for intellectual-disability determinations due to the high stakes of the penalty involved: the irrevocable taking of a person's life.

First, as *Hooks* makes clear, the nature of an *Atkins* proceeding clearly compels a determination that the Sixth Amendment's guarantee of effective assistance of counsel attaches to the proceeding. For petitioners like Hill, an *Atkins* proceeding is "'postconviction' only in the strict chronological sense." *Id.* at 1183. Because *Atkins* was decided in 2002, after Hill had been convicted and sentenced in 1986, Hill's *Atkins* hearing was "'the first designated proceeding' at which he could raise a claim of mental retardation." *Id.* (quoting *Martinez v. Ryan*, 566 U.S. 1, 11 (2012)). That Hill had not and could not previously litigate his substantive constitutional right not to be executed due to his intellectual disability "underscores the importance of providing a capital defendant with the opportunity to fully present his constitutional issue, even in the postconviction context." *State v. Lorraine*, No. 2003-T-0159, 2005 WL 1208119, at *6 (Ohio Ct. App. May 20, 2005). Moreover, because the *Atkins* hearing was Hill's first time arguing the merits of his constitutional claim, Hill did not "have a brief from counsel or an opinion of the court" on the issue, rendering Hill "ill equipped to represent [himself]." *Martinez,*

566 U.S. at 11 (quoting *Halbert v. Michigan*, 545 U.S. 605, 617 (2005)).[14]  Consequently, "the usual rationale for denying a right to counsel in postconviction proceedings is inapposite." *Hooks*, 689 F.3d at 1183.[15]  In the death-penalty context, a defendant's first opportunity to argue that the State should not impose a capital sentence is always accompanied by the Sixth Amendment right to effective assistance of counsel.  There is no reason why that should not be the case here.

Although initiated by a civil petition in cases like Hill's, an *Atkins* claim is intimately associated with a capital criminal prosecution and its sentencing proceeding.  Both the Supreme Court and the Sixth Circuit recognize that an Eighth Amendment prohibition on the execution of intellectually disabled persons imposes a substantive restriction on "the State's power to punish." *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), *abrogated on other grounds by Atkins*, 536 U.S. at 304; *see Atkins*, 536 U.S. at 321; *Hill*, 300 F.3d at 681–82.  Because an *Atkins* hearing goes to the essential question of whether the State can impose the death penalty at all, it is "inextricably intertwined with sentencing" and therefore cannot simply be categorized as a civil proceeding. *Hooks*, 689 F.3d at 1184; *see also Montgomery*, 577 U.S. at 205–06; *Austin v. United States*, 509 U.S. 602, 608–09 n.4 (1993) (noting that "protections associated with criminal cases may apply to a [civil proceeding] if it is so punitive that the proceeding must reasonably be considered criminal").  And it is beyond question that an *Atkins* hearing is a critical stage of a criminal proceeding, holding "significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 696 (2002); *Hooks*, 689 F.3d at 1184 ("We are hard-pressed to imagine a more 'significant consequence[] for the accused' than a determination of whether the State has the power to take his life." (alteration in original) (quoting *Bell*, 535 U.S. at 696)).  Thus, in his *Atkins* proceeding, Hill has the Sixth Amendment right to effective assistance of counsel guaranteed to all critical

[14]The trial court also suggested that Hill's "case may present a first time opportunity for an Ohio common pleas court to determine whether the *Atkins* decision bars the execution of a particular Death Row Inmate." R. 97 [disc 1] (Suppl. App.) (Page 177).

[15]I join the Tenth Circuit in querying "whether the retroactive applicability of *Atkins* to cases on collateral review . . . makes void, as a matter of law, any '*post* conviction' character that an *Atkins* proceeding might have." *Hooks*, 689 F.3d at 1183–84 n.18; *see also Montgomery v. Louisiana*, 577 U.S. 190, 205 (2016) (noting "that the retroactive application of substantive rules does not implicate a State's weighty interests in ensuring finality of convictions and sentences" because "no resources marshaled by a State could preserve a conviction or sentence that the Constitution deprives the State of power to impose").

stages of criminal proceedings, including sentencing proceedings. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

Additionally, the Fourteenth Amendment's fundamental-fairness jurisprudence compels us to conclude that *Atkins* hearings occurring due to retroactivity require effective assistance of counsel. Importantly, neither *Martinez* nor *Coleman* forecloses applying the Fourteenth Amendment's fundamental-fairness concerns to this issue. As *Martinez* notes, "*Coleman v. Thompson*, left open . . . a question of constitutional law" and "suggested, though without holding, that the Constitution may require States to provide counsel in initial-review collateral proceedings because 'in [these] cases . . . state collateral review is the first place a prisoner can present a challenge to his conviction.'" *Martinez*, 566 U.S. at 8 (second and third alterations in original) (quoting *Coleman*, 501 U.S. at 755). And *Martinez* declined to answer that constitutional question. *Id.* at 9.

As discussed above, Hill's *Atkins* posture is akin, but not identical, to an initial-review collateral proceeding. No Supreme Court caselaw explicitly precludes applying due-process considerations to this issue. In fact, the Supreme Court's Due Process jurisprudence implicitly and explicitly mandates that fundamental fairness requires the effective assistance of counsel as a procedural safeguard in *Atkins* proceedings, even if they occur after a petitioner's conviction and initial sentencing due to chronological happenstance. In assessing what due process requires for the post-conviction collateral proceedings at issue in *Coleman*, *Murray v. Giarratano*, 492 U.S. 1 (1989), and *Pennsylvania v. Finley*, the Supreme Court held that "the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer." 481 U.S. 551, 557 (1987). Unlike the discretionary post-conviction collateral proceedings at issue in those cases, "the Constitution requires state collateral review courts to give retroactive effect to [substantive rules]," which includes any procedural requirements, such as hearings, that "give[] effect" to the Supreme Court's "substantive holding." *Montgomery*, 577 U.S. at 200, 210. Unlike other post-conviction claims that states are allowed to bar, states are constitutionally required to provide hearings for non-frivolous *Atkins* claims. Unlike collateral attacks that attempt to "upset the prior determination of guilt," *Finley*, 481 U.S. at 555 (quoting *Ross v. Moffit*, 417 U.S. 600, 611 (1974)), an *Atkins* claim seeks to demonstrate that the imposed

sentence is in fact void. *See Montgomery*, 577 U.S. at 203 ("[A] court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced."). Defendants like Hill are in a "fundamentally different position." *Finley*, 481 U.S. at 559. They seek to vindicate a constitutionally mandated right and to litigate their first opportunity to challenge the State's effort to deprive them of their life.

Due to Hill's unique position, at the very least, fundamental fairness mandates that he receives effective assistance of counsel. "[F]undamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'" *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (quoting *Ross*, 417 U.S. at 612). "[T]he lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the factfinding determination." *Ford*, 477 U.S. at 417 (Marshall, J.) (plurality opinion). This is particularly so in the Eighth Amendment context where "[t]he stakes are high." *Id.*; *see also id.* at 425 (Powell, J., concurring in part and concurring in the judgment) ("Due process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'" (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976))).

The nature of an *Atkins* hearing evinces a clear need for effective assistance of counsel. One reason is because of the penalty at issue. The Supreme Court has consistently recognized the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). In turn, the Court has held that determining "whether [a] petitioner should be executed at all," requires "heightened procedural requirements." *Ford*, 477 U.S. at 425 (Powell, J., concurring in part and concurring in the judgment); *see Murray*, 492 U.S. at 8–9 (noting that heightened protections are needed when a court and jury "decide the question[] of . . . punishment"). Among the myriad of procedural protections afforded to defendants in capital proceedings to ensure fairness and reliability, the most basic and fundamental is the right to effective counsel. As the Supreme Court explained in *Powell v. Alabama*, "[t]he right to be heard," especially for "those of feeble intellect," "would be, in many cases, of little avail if it did not comprehend the

right to be heard by counsel." 287 U.S. 45, 68–69 (1932); *see also Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938) (stating that the right to counsel "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty"). Without the assistance of counsel, in cases like Hill's, the defendant often remains unequipped to develop and litigate effectively the factual and legal basis for an *Atkins* claim and already is at a disadvantage due to confinement and intellectual disabilities. Under these conditions, when the defendant has the burden of proof, the fairness and reliability of an *Atkins* proceeding must be called into question. To hold that defendants do not have a right to counsel in an *Atkins* hearing, when it is the first opportunity to determine whether the State has the power to execute a petitioner under the applicable law, would require us to ignore the great weight of Supreme Court precedent that instructs us that a proceeding determining the irreversible punishment of death necessitates additional procedural protections. The loss of the right to counsel would ensure that "justice will not 'still be done.'" *Johnson*, 304 U.S. at 462 (citation omitted).

Second, a claim of intellectual disability makes defendants like Hill different from other petitioners, even other capital petitioners, because "some characteristics of [intellectual disability] undermine the strength of the procedural protections that [the Supreme Court's] capital jurisprudence steadfastly guards." *Atkins*, 536 U.S. at 317. Persons with intellectual disabilities "have diminished capacities to understand and process information, to communicate, . . . [and] engage in logical reasoning." *Id.* at 318. To force them to litigate their condition without the aid of counsel by definition leaves them subject to an increased risk of wrongful execution. *See id.* at 306–07 (noting that these "impairments can jeopardize the reliability and fairness of capital proceedings"). And any perceived competence could lead judges and juries to find a lack of a disability, just as the Ohio courts did with Hill. Furthermore, due to the infirmities of those who are intellectually disabled, the risk that they might be executed in violation of the Eighth Amendment is heightened if their counsel provides ineffective assistance. For an action in which the State's legitimacy must be unassailable, the failure to recognize a constitutional right to counsel in *Atkins* hearings occurring post-conviction would inflict grievous doubts on the legitimacy of the State to take the life of one of its citizens.

Whatever procedures a state devises to give effect to the Supreme Court's substantive holding in *Atkins*, the Supreme Court's reasoning in *Atkins* and its fundamental fairness jurisprudence already have established a constitutional floor, which includes effective assistance of counsel. Due to the nature of the penalty and the "special risk of wrongful execution" that intellectually disabled defendants face, *Atkins*, 536 U.S. at 321, the risk of a wrongful sentence is intolerably high without the assistance of counsel. That is a risk that the Due Process Clause cannot tolerate. And it is a risk that we, as a society, cannot tolerate. *See Gardner*, 430 U.S. at 357–58.

Following *Hooks* and based on the above discussion, it is clear that "the right to counsel flows directly from, and is a *necessary* corollary to, the clearly established law of *Atkins*." *Hooks*, 689 F.3d at 1184. I acknowledge, as does the Tenth Circuit, that the Supreme Court has never explicitly said that defendants have a right to counsel in *Atkins* proceedings or identified an *Atkins* proceeding as a critical stage. *Id.* But the Court's recognition in *Atkins* of the impairments caused by intellectual disability and their effects on the reliability and fairness of capital proceedings, as well as the Court's Due Process jurisprudence at the time of *Atkins*, dictate only one conclusion. In a proceeding in which one of our fundamental rights, the right to life, can be extinguished by the State, the Sixth Amendment and due process demand, at the very least, the right to effective assistance of counsel as a safeguard to ensure a court's determination in an *Atkins* proceeding is fundamentally fair. *See id.* at 1185. I see no other constitutionally permitted outcome.

"[F]undamental fairness is the central concern of the writ of habeas corpus." *Strickland v. Washington*, 466 U.S. 668, 697 (1984). In this context, not only would § 2554(i) curtail a constitutional right, but also it would run afoul of the central purpose of the constitutional writ that it governs. For these reasons, we should conclude that Hill had a right to effective assistance of counsel during his *Atkins* hearing and thus § 2254(i) does not bar his claim.

**IV. CONCLUSION**

Long before the Supreme Court decided *Atkins*, teachers, administrators, psychologists, and even the Ohio courts all determined that Danny Hill is intellectually disabled. Voluminous records and observations detail Hill's significant struggles with academics, self-care, and other adaptive skills. At the time of Hill's sentencing, none of those determinations carried any constitutional significance in barring the State from imposing the death penalty as Hill's sentence for his conviction. But they mattered. That changed after *Atkins* held that the Eighth Amendment bars the execution of intellectually disabled defendants. Now their consequence also carried constitutional heft. Faced with a potential restriction on the ability of Ohio to execute Hill, the Ohio courts reversed course and heedlessly discounted or disregarded the historical evidence they once respected and considered. The question before us is whether this sea change was an unreasonable application of *Atkins* and resulted in an unreasonable factual determination. Somehow, the majority here answers no, brushing a thin veneer of deference over the Ohio courts' glaring omissions and mischaracterizations of the record and blatant alteration of *Atkins*'s requirements. But the basic tenets of *Atkins* and the record evidence compel us not to discount or disregard the Ohio courts' unreasonable determinations. They matter. Respectfully, I dissent.

## V. Suppression of Pretrial Statements to the Police

In addition to challenging his eligibility for the death penalty after *Atkins*, Hill raised several challenges to his conviction in his habeas petition. Because we remanded his case to the state court after *Atkins* was decided in 2002, we did not reach the merits of those claims. *Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002). We do so now and **AFFIRM** his conviction.

Hill contends that the Ohio courts unreasonably applied clearly established federal law in determining that Hill's statements to police were admissible. Hill maintains that his statements were "involuntary and false" because: his intellectual disability made him especially vulnerable to police coercion; his intellectual deficiencies were known by the police, including interrogators Sergeant Thomas Stewart, Sergeant Dennis Steinbeck, and his physically abusive uncle, Detective Morris Hill; the police made statements to Hill that led him to believe that denying guilt was "hopeless"; and Hill lacked the intellectual capacity to understand the legal consequences of the statements he made (and the police recorded) while he was at the Warren police station.

Because the Ohio courts rejected this claim on the merits as part of Hill's direct appeal, *see Hill*, 595 N.E.2d at 890-91; *Hill*, 1989 WL 142761, at **5-8, Hill must show that the state courts' decisions involved an unreasonable application of clearly established federal law, as determined by the Supreme Court. S*ee* 28 U.S.C. § 2254(d)(1). "[A]n unreasonable application of th[e Supreme Court's] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citation and quotation marks omitted).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "[a] suspect in custody must be advised . . .[,] 'prior to any questioning[,] that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010)

(quoting *Miranda*, 384 U.S. at 479). This holding was necessitated by the Supreme Court's acknowledgement that "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." *Dickerson v. United States*, 530 U.S. 428, 434-35 (2000) (citation, quotation marks, and ellipses omitted). Thus, "[w]hen police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985); *see also Lego v. Twomey*, 404 U.S. 477, 487-88 (1972) ("[*Miranda*] excludes confessions flowing from custodial interrogations unless adequate warnings were administered and a waiver was obtained.").

In this case, it is undisputed that Hill was given *Miranda* warnings and signed a waiver prior to making the recorded statements that he sought to suppress at trial. Hill's challenge, then, is to the validity of that waiver. He argues that because his waiver was not knowing, intelligent, and voluntary, it was invalid.

A suspect may waive his *Miranda* rights only if "the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation and quotation marks omitted).

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation [reveals] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (citations and quotation marks omitted). For a waiver to be knowing and intelligent, the suspect must be "fully advised of [his] constitutional privilege[s]." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). To be voluntary, a confession may not be "the product of coercion, either physical or psychological." *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). However, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of

compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *see, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 317 (1985) ("[T]he [Supreme] Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily.") (citation omitted).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary . . . .'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Although a suspect's mental condition may be a "significant factor in the 'voluntariness' calculus," that "mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'"[11] *Id.* at 164.

On December 16, 1985, the Ohio state trial court held a hearing on Hill's motion to suppress his audio- and video-taped statements to the police.[12] At the suppression hearing, witnesses testified to the following facts.

On September 12, 1985, two days after Fife was attacked, Hill went to the Warren Police Department and approached Sergeant Stewart to talk about that "boy being beat up in the field." R. 28, PageID# 2748-49. Stewart, who was a friend of Detective Hill and had known (Danny) Hill since he was approximately six years old, agreed to talk to Hill in the "Narcotics Room." *Id.* at 2750-51, 2782. Stewart testified that Hill had come to the police station voluntarily, i.e., that no one had "brought him in," and Hill's testimony corroborated this assertion. *Id.* at 2751; R. 29, PageID# 3130.

Once in the Narcotics Room, Hill told Stewart that he had seen another boy, Reecie Lowery, riding the bike of the boy "who was beat up." R. 28, PageID# 2751-52. When Stewart asked Hill, "How do you know it's the boy's bike?", Hill responded, "I know it is." *Id.* at 2752.

---

[11]Under Supreme Court precedent, a person who meets the standard for intellectual disability may not be executed. As discussed extensively above, we find that Hill is intellectually disabled and is entitled to have the writ issue with respect to his sentence. However, the requirements for determining whether someone is intellectually disabled under *Atkins* and *Lott* are different from the requirements for determining whether a waiver is knowing and voluntary under *Miranda*. And a person who is intellectually disabled may still be able to knowingly and voluntarily waive his *Miranda* rights.

[12]The transcript of the suppression hearing can be found in the district court record at R. 28 and R. 29 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28, 1997). Because the pagination in the original transcript is unclear, we will cite to the pagination used by the district court.

Hill then told Stewart about the bike's location and encouraged Stewart to "go out and get the bike" before Lowery put it back in the wooded field where Fife was attacked. *Id.* After Hill told Stewart that he was willing to show him where the bike was located, Stewart and Hill began talking about various persons, including Tim Collins and Tim Combs (Hill's co-defendant). Hill insinuated that both Collins and Combs liked boys and might have been the ones who attacked Fife. At some point during their talk, Hill mentioned that Fife was choked with his underwear. *Id.* at 2756-57.

Eventually, Stewart drove Hill to look for the bike, but because it was raining and visibility was poor, Stewart and Hill did not go to the wooded field. Instead, Hill showed Stewart where Combs lived. *Id.* at 2753-54. After dropping Hill off at his house, Stewart compiled a report that he shared with his fellow officers, including Sergeant Steinbeck. *Id.* at 2755, 2757-58.

The next day, September 13, 1985, Steinbeck went to Hill's home around 9:30 or 10:00 in the morning to follow-up on the information that Hill had given to Stewart. Steinbeck asked Hill to come talk to him at the police station and Hill agreed. *Id.* at 2762-63, 2881. Hill was driven to the police station in the front seat of Steinbeck's police cruiser and was not booked, fingerprinted, or placed under arrest. Steinbeck read Hill his *Miranda* rights aloud, asked Hill if he understood those rights, and had Hill sign a waiver of his *Miranda* rights before questioning Hill off and on for approximately three hours. *Id.* at 2863-64, 2882-84. During those three hours, Hill never asked for the questioning to stop, tried to leave, or asked to see an attorney. *Id.* at 2865-66, 2885-89. After talking to Hill, Steinbeck transcribed a copy of Hill's statement, which also included a recital of his *Miranda* rights. However, Hill did not sign the statement that day because Steinbeck had forgotten to ask him to do so after telling Hill he could go home with his mother. *Id.* at 2866-69, 2889-90.

On September 16, 1985, both Steinbeck and Detective Hill went to Hill's home, ostensibly to ask Hill to sign his statement from September 13 and to ask Hill's mother for a written statement regarding Hill's alleged alibi. After putting up some initial resistance to speaking to the police again, Hill, at the behest of his mother, agreed to come down to the police

station, this time accompanied by his mother.  Hill was not placed under arrest, booked, fingerprinted, or handcuffed.  *Id.* at 2869-70, 2890-92, 2899-2901, 2930-32.

In the interrogation room, and apparently separated from his mother, Hill was verbally advised of his *Miranda* rights by Detective Hill.  *Id.* at 2871, 2901-02, 2933.  Hill indicated that he understood his rights.  *Id.* at 2902.  Although not initially present, Sergeant Stewart eventually encountered Sergeant Steinbeck and Detective Hill in the interrogation room with (Danny) Hill.  *Id.* at 2758, 2872, 2908.  At some point, officers told Hill they did not believe he was telling the truth, and Stewart told Hill that he needed to be honest if he had "anything to do with [Fife's murder]."  *Id.* at 2872, 2909-10.  Officers also told Hill that it would "benefit him" to tell them the truth, believing that Combs would likely blame the attack on Hill alone.  *Id.* at 2909.

Apparently at Hill's request, Detective Hill was left alone with his nephew.  According to (Danny) Hill, while he and Detective Hill were alone, Detective Hill "threw [him] against the wall," slapped him across the face, and told him that he "better tell" the police what happened.  *Id.* at 2759, 2810-11, 2859, 2910, 2936-37, 2953.  Hill also testified that his uncle kicked him under the table in order to prompt Hill to (1) consent to his statement being taped and (2) begin talking to police at the beginning of the taping.

Detective Hill, unsurprisingly, described the time he spent alone with his nephew very differently, testifying:

> At that point in time, you know, I set [sic] there, and I tried to let Danny know that wasn't anyone [sic] going to hurt him.  No one was going to do anything to him, but [I also told him] the fact that I kn[e]w that he was involved in the homicide, and I wanted to get the truth out of him.  At that point in time, he looked at me and tears started to come from his eyes.  When tears started coming from his eyes, he told me . . . , "I was there.  I was in the field when he got murdered."  When the young Fife kid got murdered.[13]

R. 28, PageID# 2937.  When Detective Hill emerged from the interrogation room a few minutes later, he told the other officers that Hill was going to cooperate and tell them what happened.  At the time Detective Hill made this announcement, Hill was either crying or had tears in his eyes.  *Id.* at 2759, 2811, 2839, 2873, 2937-38.

---

[13]Detective Hill also denied kicking his nephew.

At Stewart's suggestion, Hill gave the police permission to tape his statement. *Id.* at 2759-60, 2873-76, 2912. Sergeant Steinbeck, Sergeant Stewart, and Detective Hill were all present when Hill gave this initial audiotaped statement, as well as when Hill gave a second statement that was videotaped by Detective James Teeple. *Id.* at 2874-75. According to Stewart, Hill was not crying during the taped statement itself. About halfway through the audio-taping, the police asked Hill to sign the statement he had given to Steinbeck on September 13. *Id.* at 2903. Hill was also read his *Miranda* rights once more at some point prior to giving the second, videotaped statement. *Id.* at 2876, 2923, 2963-64. While giving his statements, Hill never asked to stop the interrogation, requested an attorney, or asked to leave. Sometime after the interrogation, Hill was placed under arrest based on the details included in his statements. *Id.* at 2776.

When asked questions about the nature of the interrogation generally, both Detective Hill and Sergeant Stewart denied that the police threatened or made promises to Hill during the interrogation, and asserted that Hill never asked for a lawyer. *Id.* at 2760, 2772, 2935, 2938. When prompted by the prosecutor about Hill's previous encounters with the police, Detective Hill estimated that by the date of the September 16, 1985 interrogation, Hill had been arrested by the Warren Police Department "[a]pproximately 15 to 20 times." *Id.* at 2929. Both Detective Hill and Sergeant Steinbeck testified that they had arrested Hill on prior occasions and had read him his *Miranda* rights "[m]any times." *Id.* at 2876, 2928-29. And two of the prosecution's exhibits at the suppression hearing included a waiver form and voluntary statement—both of which included a recitation of *Miranda* rights—signed by Hill on March 6, 1984, which was approximately a year-and-a-half before the September 16, 1985 interrogation.

In adjudicating this claim, the state appellate court rejected Hill's argument that his waiver of his *Miranda* rights was invalid. *Hill*, 1989 WL 142761, at *5. Acknowledging that it needed to make "discrete inquiries" as to both the "knowing and intelligent" and "voluntary" aspects of Hill's waiver, the appellate court considered these criteria in turn.

With regard to the knowing and intelligent factor, the appellate court noted that although the "lack of mental acuity . . . can interfere with an accused's ability to give a knowing and intelligent waiver," there is no bright line rule for distinguishing between "those capable of an

intelligent waiver from those who lack the ability to do so." *Id.* The appellate court also acknowledged the Supreme Court's admonition in *Connelly* that a suspect's mental condition, by itself, does not necessarily prevent him from effectively waiving his *Miranda* rights. *Id.* In analyzing the facts of Hill's case specifically, the appellate court opined:

> [Hill] admittedly suffers from some mental retardation (although the evidence presented is divergent as to the severity of the handicap) and has had concomitant difficulties in language comprehension throughout his formal education. [Hill] is categorized as being mildly to moderately retarded. Evidence was presented which indicates that appellant is illiterate and this court acknowledges that literal recognition of each word contained in the "*Miranda* Rights" and/or "waiver form" may be beyond [Hill's] mental comprehensive capacity.
>
> However, from the record here, particularly during the suppression hearing, this court is also aware (as was the trial court below) of the long and multi-faceted exposure [Hill] has had with the state's criminal justice system. The evidential table in this case also demonstrates that [Hill] exhibited a functional capacity to understand these rights, including the right to appointed counsel. This was evident from the exchange that occurred during the audio and video tape sessions. The officers who interrogated [Hill] had either significant contact with him and/or had questioned him on prior occasions and had developed informed estimates as to [Hill's] ability to understand, albeit in a vernacular sense, all aspects of the *Miranda* warning. The audio and video tapes of [Hill's] interrogations disclose that [Hill] was capable of understanding the questions put to him and of responding intelligently.
>
> Moreover, the behavior of [Hill] during the police investigation belies the notion that he was no more than a malleable victim of police suggestion. [Hill] possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, [Hill] qualified and corrected the police officers' misstatements of the factual scenario which he had related to them. He also was able to follow "verbal concepting," displaying an understanding of the officers' direction of questioning and the dialogue utilized during the interrogation.

*Hill*, 1989 WL 142761, at *6. Based on the aforementioned concerns, and citing the Supreme Court's decisions in *Miranda* and *Lego* in support, the state appellate concluded that Hill's waiver was knowing and intelligent. *Id.*

In addressing voluntariness, the appellate court rejected Hill's argument that his waiver was involuntary "as a result of his mental [infirmities] and the coercive action of the police." *Id.* First, the court noted that Hill's IQ was not necessarily dispositive as to whether he was

incapable of voluntarily waiving his *Miranda* rights, particularly since he had been read those rights in his many prior encounters with police. *Id.* at **6-7. In addressing Hill's argument that his intellectual deficiencies made him vulnerable to the police officers' "psychological ploys," the appellate court noted that Hill was read his *Miranda* rights multiple times on September 13 and 16, 1985, and "appeared articulate and coherent as he answered questions." *Id.* at *8. Finally, in concluding that the record was "devoid of evidence indicating that the custodial interrogation of [Hill] violated his constitutional rights," the appellate court reasoned that because (among other things): (1) Hill originally approached the police on September 12 of his own accord; (2) Hill was read his *Miranda* rights numerous times without ever being placed under arrest; and (3) "[t]he recorded conversations [between Hill and the police] d[id] not suggest the use of any improprieties by the police," Hill's *Miranda* claim was without merit. *Id.* at **9-10.

The Ohio Supreme Court ruled similarly, stating: "Upon a careful review of the record, we can discern no coercive or overreaching tactics employed by the police during questioning." *Hill*, 595 N.E.2d at 890. In making this finding, the court explicitly acknowledged that before Hill turned 18, Detective Hill "would at times physically discipline [his nephew] at the request of [Hill's] mother."[14] *Id.* In fact, the court appeared to credit Detective Hill's version of events— i.e., that "[Hill] stated to [Detective] Hill that he was 'in the field behind Valu King when the young Fife boy got murdered.'" *Id.* The court also found, based on the Supreme Court's ruling in *Connelly* and Hill's "his prior dealings with the criminal process as a juvenile," that Hill's "mental aptitude did not undercut the voluntariness of his statements or his waiver of *Miranda* rights." *Id.* Finally, the Ohio Supreme Court rejected Hill's contention that his waiver was rendered involuntary by virtue of the police's tactics during the interrogation. *Id.* at 891 ("Upon a careful review of the testimony and the audiotape and videotape statements, we do not find that the interrogation tactics used by the police officers, even in light of [Hill's] mental capacity, rendered the statements involuntary, or that the officers improperly induced [Hill] to make incriminating statements.").

---

[14]Hill was 18 at the time of the September 16, 1985 interrogation, and Detective Hill testified at the suppression hearing that he had not physically disciplined his nephew since at least six to eight months prior. R. 28, PageID# 2976.

Reviewing the state courts' decisions under § 2254(d)(1), the district court found that Hill's arguments that he should be granted habeas relief on this claim were without merit. *Hill v. Anderson*, No. 4:96-cv-00795, 1999 U.S. Dist. LEXIS 23332, at **78-92 (N. D. Ohio Sept. 29, 1999).

Applying AEDPA's deferential review standard, we ask whether the state courts unreasonably applied Supreme Court precedent in finding that Hill's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *See* 28 U.S.C. § 2254(d)(1). *Connelly* tells us that a compromised mental state does not, "by itself and apart from its relation to official coercion," vitiate a defendant's ability to waive his *Miranda* protections. *See* 479 U.S. at 164. And *Miller v. Fenton*, 474 U.S. 104 (1985), directs us to treat state-court findings on "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings" as "conclusive" on habeas review if they are "fairly supported in the record." *Id.* at 117.

In light of these admonitions, the state courts' conclusion that Hill effectively waived his *Miranda* rights was not "unreasonable" as that term has been defined by the Supreme Court. The state courts could plausibly credit Detective Hill's account of his interrogation techniques over Hill's allegations of physical abuse to find a lack of undue coercion and could point to Hill's prior experiences with the criminal justice system and the *Miranda* process as evidence that Hill understood the nature of his waiver.

Although the required deference to the state courts' finding compels our holding on this issue, we wish to express our consternation with this result. The record contains ample evidence demonstrating that Hill's waiver was neither voluntary nor knowing. Hill was interrogated, in private, by a police-officer uncle who admitted to disciplining Hill physically in the past, and who allegedly "'threw [Hill] against the wall,' slapped him across the face, and told him that he 'better tell' the police what happened" during the course of the interrogation. *Supra* p. 28. Hill's uncle then purportedly kicked Hill under the table to induce his consent to a videotaped confession and kicked Hill again when he was reluctant to begin the confession. When considered alongside Hill's intellectual disabilities, Detective Hill's behavior raises grave questions about the voluntariness of Hill's waiver.

And while Hill was certainly exposed several times to *Miranda* warnings, we are not convinced that he ever registered the warnings' meaning. During the suppression hearing the state trial court held in 1985, Hill's attorney asked Hill a number of basic questions about his understanding of *Miranda*:

Q:  [W]hat are your Constitutional Rights?
A:  I don't know.
Q:  What's the word constitution mean?
A:  I don't know.
Q:  What's the word appointed—
A:  When you point at somebody.
Q:  You point at somebody?
A:  Yeah.

. . . .

Q:  When the police talked to you, did you go ahead and talk to them?
A:  Yes.
Q:  Why?
A:  They police. [sic] You're supposed to talk to them.
Q:  You have to talk to them?
A:  Yep!
Q:  Do you know what's an attorney? [sic]
A:  I don't know.

R.29, PageID# 3114-16.

It is difficult, in light of this testimony, to accept the state courts' determination that Hill "exhibited a functional capacity to understand [his] rights." *Hill*, 1989 WL 142761, at *6. Nevertheless, because of the procedural posture of this case, we are compelled to affirm the district court.

Accordingly, we **AFFIRM** the district court's denial of habeas relief as to his suppression claim.

## VI.  Inflammatory Statements by the Prosecutor During Hill's Bench Trial

Hill also makes a prosecutorial misconduct claim based on the prosecutor's allegedly inflammatory statements to the three-judge panel that convicted Hill and sentenced him to death.

This claim is governed by § 2254(d)(1).  As indicated above, Hill must show that the state court's decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

The full-text of the "inflammatory statements" challenged by Hill may be found in his opening brief.  Some of those comments included:

- A reference to Raymond Fife being a 12-year-old boy from the community who had a "right to live," a right to "be in school," and a right "to be here today";
- Statements that Hill was an "animal," who "destroyed and devoured" Fife, and "would make the Marquis de Sade proud";
- A statement that "you don't necessarily have fingerprints on everything" with reference to the apparent lack of Fife's fingerprints on his bike;
- The prosecutor's opinion about which expert witness on a particular issue was "more qualified";
- A statement that Detective Hill did not want to testify against his nephew;
- A reference to Hill being a "poor, dumb boy" who nonetheless violently raped two women and therefore "relishe[d] . . . inflicting pain and torture [on] other human beings";
- A statement that Hill put Fife through a "living hell," that Fife "had no justice while he was living," and that justice demanded a guilty verdict;
- The prosecutor's opinion that defense counsel had not shown "any mitigating factors" and that the aggravated factors "clearly outweigh[ed] the absence of any mitigation";
- Two more references to Hill's history of sexual assault, which the prosecution argued belied the idea that Hill had "difficulty with his motors skills";
- A rambling soliloquy about how the prosecution would have liked to called Fife as a witness so he could describe the beating, strangulation, and sexual assault he endured, but Fife was "not here to testify about that thanks to [Hill]."  The prosecutor also stated that Fife, if alive, would have testified about how he missed his family and his friends;
- A reference to Hill as "this manifestation of evil, this anomaly to mankind, this disgrace to mankind."

In adjudicating this claim as part of Hill's direct appeal, the Ohio Supreme Court (1) noted that trial counsel never objected to any of the "complained-of comments," (2) opined that those comments were therefore subject to plain error review only, and (3) concluded that the prosecutor's statements amount to "neither prejudicial error nor plain error[.]"  *Hill*, 595 N.E.2d at 898.  The Ohio Supreme Court also noted that in Ohio, "[courts] indulge in the usual

presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *Hill*, 595 N.E.2d at 898 (quoting *State v. White*, 239 N.E.2d 65, 70 (1968)).

> The district court rejected Hill's prosecutorial misconduct claim as well, reasoning that:

> [Hill's] case was tried before a three judge panel [that] presumably was able to remember the evidence presented at trial and not be misled by any of the prosecutor's statements.  Most of the statements were harmless . . . .  Three judges should have been able to disregard any intended undue influence.[15]

1999 U.S. Dist. LEXIS 23332, at *110.  Accordingly, the district court concluded that the Ohio Supreme Court's determination that "no prejudicial or plain error occurred . . . was not an unreasonable application of clearly established law." *Id.* at **110-11.

In assessing whether the Ohio Supreme Court's decision involved an unreasonable application of federal law, the relevant Supreme Court holding is the Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), which held that "a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 576 U.S. 37, 45 (2012) (quoting *Darden*, 477 U.S. at 181).  The Supreme Court has also held that "the *Darden* standard is a very general one, leaving courts 'more leeway in reaching outcomes in case-by-case determinations.'" *Id.* at 48 (citation, quotation marks, and ellipses omitted).

In *Darden*, the Supreme Court found that comments similar to some of those made by the prosecutor in this case—particularly allusions to the death penalty and the defendant being an "animal"—were improper.  477 U.S. at 179-80.  Those comments, unlike the comments in this case, were made before a jury, not a three-judge panel. *Id.* at 170-71.  Nonetheless, the Supreme Court noted that these improper statements did not "manipulate or misstate the evidence, [or] implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.* at 182.

---

[15]The state appellate court, in adjudicating this claim, similarly noted that although some of the prosecutor's comments would have "perhaps [been] prejudicially erroneous in a jury trial, [that] was not so [in Hill's] case." *Hill*, 1989 WL 142761, at *15.

In this case, it is clear that the prosecutor's comments were emotionally charged and designed to paint Hill in a bad light. However, it does not appear that they misstated the evidence in the case or implicated Hill's constitutional rights. Further, any efforts to play on the emotions of the three-judge panel would likely have been futile. Although they may not adopt a presumption as strong as the one "indulged" by the Ohio courts, federal courts similarly presume that a judge, as the trier of fact, can readily identify credible evidence, *United States v. Thomas*, 669 F.3d 421, 425 (4th Cir. 2012), give proper weight to the evidence, *Caban v. United States*, 728 F.2d 68, 75 (2d Cir. 1984), and understand what law is relevant to his or her deliberations, *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986). And Hill has put forth no evidence indicating that the three-judge panel that tried his case was incapable of discerning what constitutes admissible evidence and parsing such evidence out from any inflammatory or irrelevant[16] comments by the prosecutor.[17] For these reasons, we conclude that the decision by the Ohio Supreme Court was not an unreasonable application of clearly established law.

We **AFFIRM** the district court's denial of habeas relief as to Hill's prosecutorial misconduct claim.

## VII. The Trial Court's Failure to Hold a Pretrial Competency Hearing

Lastly, Hill argues that the trial court's failure to inquire about Hill's competency denied him a fair trial under the due process clause of the Fourteenth Amendment. Here, the term "trial court" refers to the court that tried Hill's underlying offenses in 1985 and 1986.

This claim is governed by § 2254(d)(1). As indicated above, the Supreme Court has held that to obtain relief under § 2254(d)(1), the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error

---

[16]For example, the three-judge panel disclaimed any reliance on Hill's "prior crimes . . . in reaching its verdict." *See Hill*, 595 N.E.2d at 893.

[17]Hill's reference to a single line in the panel's opinion that referred to Hill and Combs' "blood lust characterized by a series of acts of torture, rape, and murder," does not change this conclusion. The rest of the opinion describes Fife's injuries, and the means by which they were inflicted (based on the evidence at trial), in great detail. The opinion also indicates that the judges were struck by the "total lack of remorse" shown by Hill appearing at the police station to seek a reward after Fife's death. Looking at the document as a whole, there is no indication that the comment with which Hill takes issue was derived from the prosecutor's statements rather than the judges' own assessments of the offenses.

well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In assessing competence, the relevant question is whether the defendant's "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). If the defendant's mental condition meets this description, the courts may not try him.[18] *Id.*

Hill maintains that because the trial court knew that he had "limitations in vocabulary, ability to calculate, and ability to draw" and "could not recognize or understand a majority of the words on the *Miranda* waiver form," the trial court should have "conduct[ed] further inquiry into [Hill's] competency to stand trial." Hill's Br. at 124-25. With regard to this final issue, Hill requests that this Court determine "not whether the state court was unreasonable in finding Danny competent to stand trial, but whether it was unreasonable under *Pate*[19] and *Drope*[20] not to make such an inquiry in the first instance." *Id.* at 124. Hill also argues, with no elaboration and minimal citation to the record,[21] that the Ohio Supreme Court "unreasonably applied *Pate* and *Drope*" in determining that Hill was competent to stand trial. *Id.* at 125.

The Warden, for his part, asserts that "[a]lthough Hill is intellectually limited, his demeanor at trial was such that the trial court had no reason to *sua sponte* assess Hill for competence to stand [trial]." The Warden also argues that:

> The trial record gives every indication that Hill was compliant, cooperative and appropriately attentive to the proceedings. Moreover, the trial judge had ample opportunity to assess Hill's ability to navigate through the trial proceedings, where Hill testified extensively during a pre-trial suppression hearing, and also had a direct colloquy with the trial court for acceptance of the jury waiver. In

---

[18]Again, our conclusion that Hill is intellectually disabled and thus ineligible for execution under *Atkins* does not mean that Hill was incompetent to stand trial or that the trial court should have presumed his incompetence and ordered a competency hearing *sua sponte*. The two inquiries are different, and even *Atkins* recognizes that "[m]entally retarded persons frequently . . . are competent to stand trial." 536 U.S. at 318.

[19]*Pate v. Robinson*, 383 U.S. 375 (1966).

[20]*Drope v. Missouri*, 420 U.S. 162 (1975).

[21]This issue occupies three pages in Hill's opening brief and just over a page in his reply brief. The only record citation in the opening brief seeks to demonstrate that Hill "could not recognize or understand a majority of the words on the *Miranda* waiver form."

addition, none of the three mental health experts who testified for the defense at trial expressed a concern about Hill's competence to stand trial.

Warden's Br. at 97.  Hill's reply brief does not address these contentions.

Neither the state appellate court nor the Ohio Supreme Court opinions from Hill's direct appeal noted Hill's competency argument as one of his nineteen assignments of error and twenty-five propositions of law, respectively.  *See generally State v. Hill*, 595 N.E.2d 884 (Ohio 1992); *State v. Hill*, Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27, 1989).  Instead, the only similar claims addressed by these courts pertained to Hill's arguments that he could not knowingly and voluntarily waive his right to counsel or his right to a jury trial due to his alleged intellectual disability.  *See, e.g.*, *Hill*, 595 N.E.2d at 890-91, 895; *Hill*, 1989 WL 142761, at \*\*3, 5-7, 13-14.  The district court found that Hill raised the issue of competency only under state law, not federal law, and that Hill did not raise the competency claim under federal law until filing for state post-conviction relief.  *Hill*, 1999 U.S. Dist. LEXIS 23332, at \*\*92-93.  On this basis, the district court concluded that Hill's competency claim was procedurally defaulted.  *Id.* at \*\*93-94 (citing *State v. Hill*, No. 94-T-5116, 1995 WL 418683 (Ohio Ct. App. June 16, 1995)).  The Warden argues that even if Hill's claim was not procedurally defaulted, it fails on the merits.  We agree.

On December 16, 1985, the trial court held a hearing on Hill's motion to suppress his statements to the police.  Defense counsel called Hill as a witness to testify with respect to "the circumstances under which [he] gave statements to the police department."  R. 29, PageID# 3101.  In response to the trial court's questions, Hill indicated that he understood the purpose and nature of the hearing.  *Id.* at 3103-04.  He went on to testify about the means by which he arrived at the police station, as well as his inability to leave police custody prior to the arrival of his mother on Friday, September 13, 1985.  On Monday, September 16, 1984, Hill returned to the police station at his mother's behest with his uncle, Detective Hill, and another police officer, Sergeant Steinbeck.  As discussed earlier, Hill testified that while he and Detective Hill were alone, Detective Hill threw Hill against the wall, slapped him, and told him to tell the police what had happened.  Hill also claimed that after being physically abused by his uncle, he told the

police what they wanted to hear because he was afraid of both Detective Hill and the other officers. *Id*. at 3114, 3118-19.

Defense counsel, for his part, attempted to demonstrate that Hill could neither read nor write and that Hill signed the *Miranda* waiver without understanding its contents or knowing what it meant; meanwhile, the prosecutor attempted to demonstrate that Hill had been to the Warren police department many times before based on theft-related crimes and was therefore familiar with the department's *Miranda* form. *Id*. at 3107-09, 3115, 3121-23, 3152-53, 3155. On cross-examination, Hill testified that he signed the *Miranda* waiver because the police told him to do so. *Id*. at 3135-37. Hill's testimony ended following questions from the trial court about Hill's alleged physical abuse at the hands of Detective Hill.

Hill appeared before the trial court once more on January 7, 1986, this time to waive his right to a jury trial. *See Hill*, 595 N.E.2d at 889. The trial court's colloquy with Hill, which was designed to determine whether Hill's waiver was knowing and voluntary, included an explanation of the jury selection system, the role of the jury, the jury waiver's effect on some of Hill's pending motions, defense counsel's possible motives for seeking to waive Hill's right to a jury trial, and the differences between a jury and three-judge panel in terms of number of persons, familiarity with the law and the facts of the case, and demographic composition. The trial court read the waiver aloud to Hill and suggested the Hill go over the waiver with his attorney. Waiver of Jury Trial Hr'g Tr. at 10-11.[22] Hill indicated that he had discussed the issue of waiver with both his attorney and his mother, and there was a 25-minute recess in which the attorney and Hill's mother apparently discussed the waiver with him further. *Id*. at 5-6. After the recess, Hill affirmatively stated that he wanted to be tried by the three-judge panel. *Id*. at 12.

A review of Hill's testimony during the December 16, 1985, suppression hearing reveals that Hill claimed to understand the nature of the hearing and was able to answer questions posed by the prosecutor, defense counsel, and the trial court. Hill stated more than once when he did not understand or did not know the answer to a question, either on his own or with attorney prompting. He also appeared to understand the role of the trial judge. Hill's interactions with

---

[22]The transcript of the jury waiver hearing can be found in the district court record at R. 30 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28. 1997).

the trial court at the January 7, 1986 hearing on his waiver of jury trial also failed to raise any red flags regarding competence. Although the trial court did most of the talking, Hill did not express any confusion about the nature of the waiver, and was given an opportunity to go over the considerations discussed by the trial court with his attorney and mother before and during the hearing. After Hill conferred with his attorney, the following exchange took place:

> COURT:  All right. Danny, you've been talking with your lawyer now, have you not, for the last 25 minutes or so?
> DEFENDANT HILL:  Yeah.
> COURT:  And did he go over this matter of a jury trial with you?
> DEFENDANT HILL:  Yeah.
> COURT:  And you want to tell me now what decision you've made after talking this over.
> DEFENDANT HILL:  I want to have—
> COURT:  What do you want to do? Who do you want to try it? Three judges—
> DEFENDANT HILL:  Three judges.
> COURT:  —or do you want the jury?
> DEFENDANT HILL:  You.
> COURT:  I hope you understand—you mean myself and two other judges?
> DEFENDANT HILL:  (Nods head affirmatively.)

*Id.* At no point during the hearing did Hill behave in a manner, or make a statement indicating, that he did not understand the nature of the waiver.

On this record, there is no indication that Hill did not understand the nature of the proceedings against him or that he could not consult with defense counsel to assist in his case. *See Edwards*, 554 U.S. at 170. Although Hill is correct that the record suggests that he was functionally illiterate at the time of the suppression hearing, Hill cites no authority for the proposition that trial courts should equate illiteracy to incompetence. He also cites no authority for the proposition that because there were other signs that he was intellectually limited, i.e., his limited vocabulary or "ability to draw similarities," the trial court should have doubted his competence to stand trial and ordered a competency hearing *sua sponte*. As indicated above, the trial court had at least two opportunities to observe Hill and interact with him directly, and these incidents did not suggest that Hill was incompetent to stand trial under *Pate*, *Drope*, or the more recent Supreme Court case, *Edwards*.

For the aforementioned reasons, we **AFFIRM** the district court's denial of habeas relief as to Hill's due process claim.